James P. ROGERS, Estate of Charles R. Brophy, Desmond D. Brophy, Donald R. Brophy, Douglas K. Brophy, James P. Brophy, III, Estate of James P. Brophy, Joseph Paul Brophy, Joseph Paul Brophy, Jr., Martin D. Brophy, Thomas E. Brophy, Todd R. Brophy, Conrad Oil & Gas, Ltd., Marguerite Conrad, Harris Lett, Otto E. Lueking, Jr., and Kitzmiller Grazing Association, Inc., Plaintiffs–Appellees and Cross–Appellants,

v.

WESTERMAN FARM COMPANY, H.G. Westerman, Carl A. Westerman, Loyle P. Miller, Joe Gray, JG–Kansas No. 2 Venture, Dr. Ralph M. Connell, Connell Family Living Trust, Thomas J. Jeffrey, Meredith Mallory, Jr., The Travis Family Trust B, and Rosewood Resources, Inc., Defendants–Appellants and Cross–Appellees,

and

J–W Operating Company and Samedan Oil Corporation, Defendants and Cross–Appellees.

No. 97CA0293.

Colorado Court of Appeals, Div. II.

Dec. 24, 1998.

As Modified on Denial of Rehearing March 11, 1999.

Certiorari Granted Sept. 13, 1999.

Benedetti & Dee, Robert H. Dee, Wray; Rasmussen, Barton & Willis, L.L.C., George A. Barton, Kansas City, Missouri, for Plaintiffs–Appellees and Cross–Appellants.

Welborn, Sullivan, Meck & Tooley, P.C., Keith D. Tooley, Brian S. Tooley, Denver, Colorado, for Defendants–Appellants and Cross–Appellees Westerman Farm Company, H.G. Westerman, Carl A. Westerman, and Loyle P. Miller and Defendant and Cross–Appellee J–W Operating Company

Walter H. Sargent, P.C., Walter H. Sargent, Colorado Springs, Colorado; Holme Roberts & Owen, LLP, Spencer T. Denison, Martin D. Litt, Denver, Colorado, for Defendants–Appellants and 'Cross–Appellees Joe Gray, JG–Kansas No. 2 Venture, Dr. Ralph M. Connell, Connell Family Living Trust, Thomas J. Jeffrey, Meredith Mallory, Jr., The Travis Family Trust B, and Rosewood Resources, Inc. and Defendant and Cross–Appellee Samedan Oil Corporation

Hall & Evans, LLC., Brooke Wunnicke, Denver, Colorado; Bjork, Lindley, Danielson, & Baker, P.C., Laura Lindley, Denver, Colorado, for Amicus Curiae Colorado Oil and Gas Association and Rocky Mountain Oil and Gas Association

Dufford, Waldeck, Milburn & Krohn, William H.T. Frey, Flint B. Ogle, Grand Junction, Colorado; Stead & Heath, P.C., Robin Stead, Donald F. Heath, Jr., Oklahoma City, Oklahoma, for Amicus Curiae National Association of Royalty Owners, Inc.

McDaniel Baty & Miller, LLC, G.R. Miller, Durango, Colorado; Fleeson, Gooing, Coulson & Kitch, Thomas D. Kitch, Gregory J. Stucky, Wichita, Kansas, for Amicus Curiae Richard Parry, Linda Parry, Petrogulf Corporation, Douglas Cameron Mcleod, Evelyn L. Payne and David G. Groblebe

Opinion by Judge CRISWELL.

Defendants, working interest owners of oil and gas leases on lands located in Yuma County, appeal from the judgment entered on special jury verdicts, which awarded damages to plaintiffs on their breach of contract claims. The verdicts upon which the judgment was based found that that natural gas which was sold by defendants at the wellhead was marketable at that point, but that gas in the same condition, when delivered to some other location, was not marketable at the wellhead, and did not become marketable until its later delivery. Plaintiffs, who are royalty and overriding royalty interest owners, cross-appeal, asserting that the damages awarded them are insufficient and that the court erroneously assessed attorney fees against them. We reverse and remand for further proceedings.

The written leases at issue were executed between 1971 and 1975 by plaintiffs or their predecessors in interest and defendants' predecessors in interest. Collectively, these leases cover some 200 natural gas wells, and they provide for payment of a 1/8th royalty interest.

Each lease also provides that the royalty payment is to be based upon the price received from the sale of gas, or upon its market value, at the mouth of the well. The provisions respecting this subject differ somewhat. Indeed, there are four different types of provisions which require a royalty payment based on either:

1. "The gross proceeds received ... where the same is sold at the mouth of the well or, if not sold at the mouth of the well, then one-eighth (1/8th) of the market value thereof at the mouth of the well ...." or

2. "the proceeds of gas as such at the mouth of the well ...." or

3. "the market price at the well for the gas sold [or] used off the premises ...." or

4. "the proceeds received for gas sold from each well ... or the market value at the well of such gas used off the premises ...."

It is undisputed that the gas produced by these wells is "sweet" and "dry." Hence, the product is of such condition and is under such pressure as it comes from the wellhead that it is suitable for consumer use at that point. Indeed, the undisputed evidence is that some of the royalty interest owners have elected to take a portion of their interest in kind and have had the gas piped into their residences where it is used without further processing.

The parties stipulated that, shortly after the leases in question were executed, one large purchaser installed the necessary facilities to receive the gas in its natural state at the wellhead. The agreement between defendants and this purchaser required that the gas meet certain purity, heating value, and temperature requirements, but all expenditures required to gather the gas and to transport it through the purchaser's pipeline were to be borne by this purchaser. Likewise, another purchaser, who was affiliated with two of the defendants, purchased gas at the wellhead under similar circumstances.

With respect to these sales of gas at the wellheads, defendants paid royalties to plaintiffs based upon the gross proceeds received from such sales without deduction of any of the costs incurred by them.

In 1988, defendants and this large purchaser amended this purchase agreement to provide that gas from certain specified wells was to be delivered by defendants to the inlet of the interstate pipeline. This agreement also provided that, with respect to this gas, defendants would dehydrate it to a specific concentration of water vapor and that they would compress it to a specified pressure. It

is undisputed that the dehydration and compression demanded by this amended agreement were not required to remove any impurities from the gas. Rather, the dehydration was required so that the gas would not cause undue deterioration to the interstate pipeline, and it was required to be compressed because, as a result of the pressure of the gas in that pipeline, gas having a lower pressure could not enter it.

The price paid for the gas delivered at the pipeline was higher than the price paid for that taken by the purchaser at the wellhead. However, defendants did not pay royalties on the gross proceeds from these sales. Instead, because they considered that the costs incurred in gathering, dehydrating, compressing, and transporting the gas from the wellhead to the pipeline were costs that enhanced the value of gas that was already in a marketable condition, they deducted those costs from the sale proceeds in an attempt to approximate the value of the gas at the wellhead before computing and paying the required royalties (known in the industry as the "net back" or "work back" method of determining value).

In 1995, some seven years after the amendment to the major purchaser's contract, plaintiffs instituted this action seeking to recover damages from defendants because of alleged underpayment of the royalties due under the various leases. As cast in their amended complaint, plaintiffs' claims were based both upon defendants' deduction of the costs for gathering, dehydrating, and compressing the product and upon their sale of some of the product to an affiliated purchaser, who assumed the responsibility to gather, dehydrate, and compress the product, for a price less than the price that would have been paid had defendants performed these functions prior to the sale.

All of the parties and the trial court recognized that resolution of the issues presented was to be made in light of the principles adopted in *Garman v. Conoco, Inc.*, 886 P.2d 652 (Colo.1994). In applying *Garman*, the trial court rejected defendants' assertion that the various provisions in the leases calling for the payment of royalties based upon the proceeds received from the sale of the product at the wellhead, or its value there, were express provisions that required the royalty owners to share in all post-production costs. Indeed, it ruled prior to trial that, to the extent that there was any inconsistency between these provisions and defendants' responsibilities under their implied obligation to market the product, this implied obligation would control. As a result, while the various leases were admitted into evidence during the trial, defendants were prohibited from reading, examining witnesses about, or otherwise referring to, these provisions.

Based upon *Garman v. Conoco, Inc., supra*, the court considered that the essential factual issue presented for jury resolution was the point at which the gas produced by the wells became marketable. It submitted this question to the jury under an instruction defining marketability to which defendants objected. Applying this instruction, the jury returned special verdicts finding that the gas sold to those purchasers who received the product at the wellhead and who themselves had assumed the responsibility for gathering, dehydrating, and compressing the product was marketable at the point of those sales. Hence, because defendants had paid royalties based on the gross proceeds from those sales, plaintiffs were not awarded any damages for an alleged underpayment of royalties on these sales.

In contrast, for those sales that required defendants to deliver the product to the pipeline and to place the product, through dehydration and compression, in a condition that would allow it to enter the pipeline, the jury determined that the gas did not become marketable until it had been placed in this condition. The jury also determined the reasonable costs that were required to be incurred to place the gas in this condition.

Based on these latter findings, the court concluded that defendants had improperly deducted those costs before computing the amount of royalties due on those sales, and it entered judgment for plaintiffs for an amount representing the additional royalties that would have been paid had those costs not been deducted. Defendants appeal and plaintiffs cross-appeal from that judgment.

## I. Principles Adopted in Garman v. Conoco, Inc.

To resolve the issues presented, we first must consider the principles adopted in *Garman v. Conoco, Inc., supra,* and, perhaps of even more significance here, determine what issues were not resolved by the court in that case.

The opinion in *Garman* was the result of the court's acceptance of a certified question from the federal district court which assumed that the assignment of the overriding royalty interest at issue there was "silent as to how post-production costs are to be borne," and which asked, in such a case, whether the owner of that interest is required to bear a proportionate share "of post-production costs, such as processing, transportation and compression." *Garman v. Conoco, Inc., supra,* 886 P.2d at 653.

The majority opinion in *Garman* emphasized this underlying assumption that the assignment involved was, indeed, "silent" with respect to such costs, and its opinion is clearly premised upon that assumption. It did not, therefore, independently determine whether the specific assignment at issue there was, in fact, "silent" upon the issue.

In contrast, the two specially concurring members of the court in *Garman* looked to the express language of the assignment in question, which provided that the lessee could deduct from any gross proceeds certain specified taxes and, applying the doctrine of *expressio unis est exclusio alterius,* concluded that that assignment did not allow other post-production costs to be shared.

Clearly, therefore, neither the majority opinion in *Garman* nor the special concurrence determined whether a provision that the royalty payment is to be based upon the value of the product at the wellhead is "silent" as to the deductibility of any post-production costs.

Further, the *Garman* majority recognized that there are a variety of "post-production costs" that may be incurred for a variety of reasons. It may be necessary to transport or "gather" the gas by moving it to a central location for further processing or transmission. It may need to be processed or compressed to remove impurities, to extract other saleable products, or to prepare it for transmission through the pipeline. And, if no market for the product exists at the wellhead, it may be necessary to transport the gas to a distant market.

█ In *Garman,* the court recognized the general rule that, absent a lease provision to the contrary, the cost required to transport an otherwise marketable product to a distant market is to be deducted before the royalty is to be computed. *See Johnson v. Jernigan,* 475 P.2d 396 (Okla.1970). Indeed, in *Garman,* the royalty owners conceded that the costs incurred to move the product from the processing plant to the pipeline were deductible.

With respect to other post-production costs, however, the *Garman* court noted that two conflicting lines of authority had evolved with respect to the treatment of such costs. It observed that the courts in Texas and Louisiana have determined that all costs incurred after the gas has been severed at the wellhead are to be shared, while the Kansas and Oklahoma courts have concluded that post-production costs designed to place the product in a marketable condition are expenses to be borne solely by the working interest owner. It also noted that Arkansas and North Dakota have adopted a rule similar to that adopted by Kansas and Oklahoma.

The *Garman* majority opinion then concluded that the nature of the lessee's implied covenant to market the product, which Colorado has recognized as being a part of every oil and gas lease, *see Davis v. Cramer,* 808 P.2d 358 (Colo.1991), supported the adoption of a rule similar to that adopted by Oklahoma and Kansas. Hence, it concluded that, absent specific lease language to the contrary, this covenant:

> obligates the lessee to incur those post-production costs necessary to place gas in a condition acceptable for market. Overriding royalty interest owners are not obligated to share in these costs.

*Garman v. Conoco, Inc., supra,* 886 P.2d at 659.

On the other hand, however:

Upon obtaining a marketable product, any additional costs to enhance the value of the *marketable* gas ... may be charged against nonworking interest owners.

*Garman v. Conoco, Inc., supra,* 886 P.2d at 661 (original emphasis).

While the question of the precise meaning of the term "marketable" in this context was not presented in *Garman,* the majority noted that the term, in general, means "fit to be offered for sale in a market; being such as may be justly and lawfully bought and sold," *see Webster's 3rd New International Dictionary* 1383 (1986), and referring to 8 H. Williams and C. Meyers, *Oil & Gas law* 692 (1993), it said that marketable gas is that which is "sufficiently free from impurities that it will be taken by a purchaser." *Garman v. Conoco, Inc., supra,* (fn. 26). Likewise, the special concurrence agreed with this definition for gas that is in a marketable form.

Finally, the *Garman* court concluded that whether any specific post-production cost was one that was incurred to place the product in marketable form or was one that enhanced the value of an already marketable product was a question of fact to be determined by the fact-finder in each case.

Since the issuance of the *Garman* opinion, the courts of Kansas and Oklahoma have generally approved its conclusions, *see Sternberger v. Marathon Oil Co.,* 257 Kan. 315, 894 P.2d 788 (1995); *Mittelstaedt v. Santa Fe Minerals, Inc.,* 954 P.2d 1203 (Okla.1998), although each state has determined, apparently as a matter of law, that the cost of compressing the gas, if done on the leased premises, cannot be deducted in computing the royalty.

Owen L. Anderson, the Eugene Kuntz Professor of Oil, Gas & Natural Resources at the University of Oklahoma College of Law, has opined that *Garman* "comes closest to the proper view of the issue of post-wellhead costs," although he questions whether, under the "proper view," it is necessary to engage in a "work back" calculation. O. Anderson, *Royalty Valuation: Should Royalty Obligations Be Determined Intrinsically, Theoretically, or Realistically?,* 37 Nat. Resources J. 611, 669 (1997).

## II. *The Silence of the Leases*

In their briefs filed with this court, defendants initially asserted that the plain language of the royalty clauses requires all royalty payments to be calculated based on the value of the gas at the mouth of the well. From this, they argued, it follows that any cost incurred after severance of the gas from the ground is a shared expense. At oral argument, however, defendants conceded that such provisions must be interpreted in light of the implied covenant to market, and thus, their interpretation assumes that the lessee has produced a marketable product at the wellhead.

The trial court, on the contrary, concluded that these provisions are irrelevant to the question whether defendants were authorized to deduct any post-production costs. We do not fully agree with either of these views.

First, these provisions must be given *some* meaning. *See U.S. Fidelity & Guaranty Co. v. Budget Rent–A–Car Systems, Inc.,* 842 P.2d 208 (Colo.1992) (each word in a contract must be given meaning if at all possible). Their most obvious purpose, at the least, is to establish the *point* of valuation. Were the leases to require the point of valuation to be at some location downstream from the wellhead, such as the inlet to the interstate pipeline, for example, it could reasonably be argued that the cost of delivering the product to that point should be borne solely by the lessee. By providing that the valuation point is the wellhead, however, these provisions confirm the traditional rule that transportation costs to some other point are to be shared.

Beyond this possible relevance upon the question of transportation costs, we conclude that the "value at the mouth of the well" language does not specifically allocate post-production costs. We conclude, rather, that the leases are silent within the meaning and context of *Garman.*

Hence, because these general provisions, considered in light of defendants' implied obligation to market, do not have the effect of allocating other specific post-production costs, *i.e.,* they are "silent" with respect to

this issue, we also conclude that the trial court committed no prejudicial error in prohibiting reference to these provisions.

However, the fact that the leases are silent with respect to the allocation of post-production costs does not mean that the lessee must bear all such costs. Under *Garman,* the defendants are required to bear only those post-production costs required to render the gas marketable. After marketability is achieved, further post-production costs will be shared by the parties, *i.e.,* the lessee may deduct such costs before computing royalties.

### III. *When Gas is "Marketable"*

Defendants assert that the trial court's instruction to the jury with respect to the marketability of the gas in this case was erroneous. We agree.

The instruction given told the jurors that: The gas in this case is marketable when it is fit to be offered for sale in a market. It is fit to be offered for sale when it (a) is sufficiently free from impurities that it will be taken by a purchaser and (b) may be justly and lawfully bought and sold. It may be justly and lawfully bought and sold by the defendants herein (a) when they are acting in good faith and dealing fairly on behalf of themselves and the Plaintiffs, and (b) when they are acting in such a manner that the Defendants and the Plaintiffs will attain their reasonable expectations under their leases.

■ The form of a jury instruction is within the sound discretion of the trial court. *Hendricks v. Weld County School District No. 6,* 895 P.2d 1120 (Colo.App.1995). However, irrespective of form, the trial court is obligated to instruct the jury correctly on the law applicable to the case. *Hansen v. State Farm Mutual Automobile Insurance Co.,* 957 P.2d 1380 (Colo.1998).

■ In *Garman v. Conoco, Inc., supra,* the supreme court held that the implied covenant to market obligates an oil and gas lessee "to incur those post-production costs necessary to place gas in a *condition acceptable for market*" at no cost to the lessor, absent specific contrary language in the lease. *Garman v. Conoco, supra,* 886 P.2d at 659 (emphasis added). Nothing in *Garman* suggests that, for the purpose of determining whether post-production costs are to be shared, factors other than the condition of the product are to be considered in determining its marketability. Hence, we conclude that, for this purpose, neither the good or bad faith of the lessee, nor its motives, nor the expectations of the parties are to be considered. The sole question in such a case is whether the product is sufficiently free from impurities that it will be taken by a purchaser.

■ On the other hand, in a case in which the claim is that post-production costs were improperly deducted, issues whether the lessee acted reasonably in expending funds either to enhance an already marketable product or to transport such a product to a distant market, or the extent to which its actions otherwise comported with the parties' reasonable expectations, may be presented. Those issues may well implicate the lessee's good faith or good judgment. *See Garman v. Conoco, Inc., supra* (even if expenditures are made to enhance value of marketable gas, lessee must demonstrate that costs were reasonable and that they increased amount of royalty proportionately with the costs assessed against the royalty interest).

Likewise, if it is the royalty owner's claim that the lessee has violated the implied covenant to market in some way other than by improperly deducting post-production costs, both the lessee's good faith and the reasonableness of its actions may be in issue. *See Davis v. Cramer, supra; Wegman v. Central Transmission, Inc.,* 499 So.2d 436 (La.App. 1986); M. William, et al., *Determining the Lessor's Royalty Share of Post–Production Costs: Is the Implied Covenant to Market the Appropriate Analytical Framework?;* 41 Rocky Mtn. Min. L. Inst. 121–1 (1995).

These latter issues, however, differ significantly from questions relating solely to the condition of the product. And, for this reason, we conclude that the court erred in attempting to combine within a single instruction defining marketability concepts relating to other issues.

Here, plaintiffs asserted two claims, each based upon different considerations.

With respect to those sales made at the wellhead, both to the large, independent purchaser and to an entity affiliated with two of the defendants, defendants had made no deductions from the sale proceeds in computing plaintiffs' royalties. Hence, plaintiffs' claim with respect to these sales, if based upon the proposition that the gas was not marketable, could not be sustained; indeed, the conclusion that gas is unmarketable, when that gas has, in fact, been marketed is logically indefensible.

The only possible claim with respect to these sales that plaintiffs could assert was that defendants did not act reasonably or in good faith in making them. Upon that issue, they alleged that defendants should have sold this gas at some downstream point, after defendant had gathered, dehydrated, and compressed the gas, so that a greater price could have been obtained for it.

The questioned instruction had relevance to this claim because it required the jurors to focus upon defendants' good faith and fair dealing and upon both parties' reasonable expectations. And, because it is undisputed that the gas was in a useable condition at the wellhead, requiring the jurors to consider its physical condition cannot be said to have been prejudicial to either party with respect to this claim.

Further, by finding that the gas sold at the wellhead was "marketable" under the instruction given, the jurors necessarily determined that the parties' reasonable expectations contemplated such sales and that defendants exercised good faith in making them. This finding is consistent with the lease provisions, which clearly contemplate sales at the wellhead. Hence, the error that we conclude was present in the instruction in question did not work its prejudice upon either party with respect to the claim based upon sales at the wellhead. And, we reject plaintiffs' assertion that the jury's finding with respect to this claim is not supported.

In contrast, however, this instruction was prejudicial to defendants with respect to the claim based upon sales made at the pipeline. However, we conclude that the judgment based on this claim is subject to a more fundamental defect.

## IV. *The Garman Claim*

Defendants assert that the undisputed evidence established that all of the gas sold by them was in a marketable condition at the wellhead. They argue, therefore, that the trial court erred in submitting this issue for jury determination. We agree.

Plaintiffs make no assertion that the gas which was delivered to the interstate pipeline was not in a *usable* condition at the wellhead. They argue, however, that, because the water content of the gas at this point was higher than that allowed in the pipeline and its pressure was less than that required to enter the pipeline, costs associated with the necessary gathering, dehydrating, and compressing of the gas must be considered as costs to render the product marketable, rather than as costs incurred to transport the product. We disagree.

In concluding that the undisputed historical facts here require the determination that all of these costs must be considered as costs related to the transportation of an already marketable product, we acknowledge that both Kansas and Oklahoma have seemingly concluded that the cost of *compressing* natural gas to meet pipeline criteria is one that is to be absorbed by the lessee. *See Sternberger v. Marathon Oil Co., supra,* and *Mittelstaedt v. Santa Fe Minerals, Inc., supra.* Nevertheless, we are persuaded that the contrary view is the proper one, both by Professor Anderson's article, 37 Nat. Resources J. 611, *supra,* and by the dissent in *Mittelstaedt.*

In his article, Anderson acknowledges that any lessee should bear the risk that the drilled well will produce nothing or that it will produce a product requiring processing to make it saleable. He argues, however, in an analysis similar but not identical to that of *Garman,* that, at the point that a marketable product is achieved, the parties' mutual purpose has been accomplished, and it is the value of the product at that point in time and space that should furnish the basis for a royalty computation.

Professor Anderson analogizes natural gas that is in a marketable condition to a harvested agricultural commodity or a manufactured product that is in its final form. He suggests that *all* costs required to move any of these products from the point of production of the saleable commodity to the purchaser should be considered as transportation costs. For example, he analogizes the cost of compressing gas to allow it to enter the pipeline to the cost of an auger used to send harvested grain to the top of the silo. Both costs, he argues, are costs associated with transporting the products. Hence, he criticizes the conclusion that the cost of compression should always be solely that of the lessee. O. Anderson, 37 Nat. Resources J., *supra* (fn.138).

■ We agree that, if, as here, the gathering, dehydrating, and compressing is performed solely to allow transmission of gas in a pipeline, and those functions are not undertaken to remove impurities or to obtain other products, the costs incurred to accomplish those functions must be considered as transportation costs. If, therefore, the net back or work back method of computation is used, all reasonable costs associated with these functions may be deducted before computing the amount of any royalty.

■ While *Garman* emphasized that the question of marketability is one for the factfinder, it also concluded that the purpose of the expenditure is determinative in allocating that expenditure. And if, as here, the condition of the product and the purpose of the expenditure are wholly undisputed, the question becomes solely one of law. *See Winkler v. Rocky Mountain Conference of United Methodist Church,* 923 P.2d 152 (Colo.App. 1995).

Hence, because the facts relating to these two considerations are undisputed, we conclude, as a matter of law, that the costs deducted by defendants were properly deducted. Thus, the judgment entered against them, which was based upon the impropriety of such deductions, must be reversed.

Further, in light of this conclusion, we need not consider defendants' further assertions of error that are based upon the trial court's evidentiary rulings.

## V. *The Cross–Appeal*

In their cross-appeal, plaintiffs argue that (1) they were entitled to a judgment, as a matter of law, for damages based upon defendants' sale of gas at the wellhead, and (2) the award of damages to them based upon sales made at the pipeline were insufficient. For the reasons discussed above, we reject both these arguments.

Plaintiffs also assert, however, that the trial court erred in awarding attorney fees against them and in favor of defendant J–W Operating Company (J–W). With respect to this assertion, we conclude that the record is insufficient to allow us to determine whether an award of fees was warranted. Therefore, we shall remand the cause to the trial court for an evidentiary hearing upon this question.

J–W is a corporation owned and controlled by one of the other defendants in this action. Some time ago, J–W entered into an arrangement with defendants pursuant to which it was to perform several tasks as an independent contractor. Specifically, J–W drilled the wells, produced the gas, and made the royalty payments to plaintiffs. J–W, however, was never a party to any of the oil and case leases, nor did it own any interest in them. Nevertheless, plaintiffs included J–W as a defendant in this action.

Sometime prior to trial, J–W moved for summary judgment, arguing that it could not be liable to plaintiffs on their breach of contract claims because it was not a working interest owner in contractual privity with plaintiffs. The trial court granted J–W's summary judgment motion and dismissed it as a defendant.

J–W then moved for attorneys fees and costs pursuant to §§13–17–101 through 13–17–103, C.R.S.1998, arguing that plaintiffs' claims against it were frivolous and groundless. Without taking any evidence upon the question whether any fees were awardable, the trial court issued an order finding plaintiffs' claims against J–W to be frivolous and groundless. Thereafter, the court conducted

a hearing only to determine the amount of the fees to be awarded.

■ The decision to award attorney fees on the basis that a claim is substantially frivolous, substantially groundless, or substantially vexatious is committed to the sound discretion of the trial court. *Engel v. Engel,* 902 P.2d 442 (Colo.App.1995). Attorney fees awarded for instituting a frivolous, groundless, or vexatious action will not be disturbed on appeal if supported by the evidence, unless the court abused its discretion in making the award. *Board of Commissioners v. Eason,* 976 P.2d 271 (Colo.App. 1998).

■ However, because a determination of entitlement to attorneys fees cannot be made without adequate findings of fact and conclusions of law, *Pedlow v. Stamp,* 776 P.2d 382 (Colo.1989) if a party makes a claim for attorneys fees, the court must hold an evidentiary hearing on the claim, if such a hearing is requested, *Zarlengo v. Farrer,* 683 P.2d 1208 (Colo.App.1984).

Here, plaintiffs requested a hearing on the issue of attorney fees in their opposition to J–W's motion. However, the trial court determined that plaintiffs' claims were frivolous and groundless and held that J–W was entitled to reasonable attorney fees without holding such a hearing. Consequently, its award of fees cannot stand, and the matter must be remanded to the trial court for a hearing and for the adoption of appropriate findings and conclusions with respect to that issue.

The judgment awarding damages to plaintiffs and attorney fees to J–W is reversed, and the cause is remanded to the trial court for further proceedings in accordance with the views expressed in this opinion.

Judge CASEBOLT and Judge VOGT, concur.