James P. ROGERS; Estate of Charles R. Brophy; Desmond D. Brophy; Donald R. Brophy; Douglas K. Brophy; James P. Brophy III; Estate of James P. Brophy; Joseph Paul Brophy; Joseph Paul Brophy, Jr.; Martin D. Brophy; Thomas E. Brophy; Todd R. Brophy; Conrad Oil & Gas, Ltd.; Marguerite Conrad; Harris Lett; Otto E. Lueking, Jr.; and Kitzmiller Grazing Association, Inc., Petitioners/Cross–Respondents,

v.

WESTERMAN FARM COMPANY; Estate of H.G. Westerman; Carl A. Westerman; Loyle P. Miller; Joe Gray; JG–Kansas No. 2 Venture; Dr. Ralph M. Connell; Connell Family Living Trust; Thomas J. Jeffrey; Meredith Mallory, Jr.; the Travis Family Trust B; Rosewood Resources, Inc.; J–W Operating Company; American Exploration Company; American Production Partnership V Ltd.; FMP Operating Co., L.P.; Freeport McMoran Inc.; Mesa Operating L.P.; Mesa Petroleum Company; MTS Limited Partnership; Ninian Oil Company; Samedan Oil Corporation; and Tejay Operating Company, Respondents/Cross–Petitioners.

No. 99SC293.

Supreme Court of Colorado, En Banc.

July 2, 2001.

As Modified on Denial of Rehearing Aug. 27, 2001.

Benedetti & Dee, Robert H. Dee, Wray, CO, Law Offices of George A. Barton, George A. Barton, Kansas City, MO, Attorneys for Petitioners/Cross–Respondents.

Welborn Sullivan Meck & Tooley, P.C., Keith D. Tooley, Brian S. Tooley, Denver, CO, Attorneys for Respondents/Cross–Petitioners Westerman Farm Company, Estate of H.G. Westerman, Carl A. Westerman, and Loyle P. Miller.

Holme Roberts & Owen, LLP, Spencer T. Denison, David S. Steefel, Jan N. Steiert, Denver, CO, Walter H. Sargent, a Professional Corporation, Walter H. Sargent, Colorado Springs, CO, Attorneys for Respondents/Cross–Petitioners Gray–Rosewood.

Ken Salazar, Attorney General, M. Patrick Wilson, Assistant Attorney General, Denver, CO, Attorneys for Amicus Curiae Colorado State Board of Land Commissioners.

McDaniel, Baty, Miller & Robbins, LLC, G.R. Miller, Durango, CO, Attorneys for Amicus Curiae Richard Parry and Linda Parry.

Hall & Evans, LLC, Brooke Wunnicke, Bjork Lindley Danielson & Baker, P.C., Laura Lindley, Colorado Oil & Gas Association, Kenneth A. Wonstolen, Denver, CO, Attorneys for Amicus Curiae Colorado Oil & Gas Association.

Stead & Heath, P.C., Robin Stead, Donald F. Heath, Jr., Oklahoma City, OK, Dufford, Waldeck, Milburn & Krohn, LLP, William H.T. Frey, Flint B. Ogle, Grand Junction, CO, Attorneys for Amicus Curiae National Association of Royalty Owners, Inc.

Justice MARTINEZ delivered the opinion of the court.

## I. FACTS AND PROCEDURE

This case involves a dispute arising from various oil and gas leases over royalty pay-

ments made by working interest owners, here the Respondents/Cross–Petitioners (collectively the lessees), to royalty interest owners, here the Petitioners/Cross–Respondents (collectively the lessors). Some of the gas under the leases was sold at the well, some was sold at the interstate pipeline, and some was used "in kind" by the lessors. The leases were executed in the mid to late 1970's. Some of the leases were subsequently assigned to the parties who are now part of this case. The leases pertain to some 200 natural gas wells. The leases all provide, with some variation, for royalties to be paid based on the gas "at the well" or "at the mouth of the well." [1] Part of the dispute in this case is whether this general language is significant in determining the allocation of costs between the parties. [2] Specifically, the dispute arises over whether this language is sufficiently clear to set forth the proper allocation between the parties of the costs of gathering, compressing, and dehydrating the gas prior to its entry into the interstate pipeline.

In the course of the proceedings in this case, terminology specific to the oil and gas industry has been used, some of which requires explanation and, where used inconsistently, resolution as to its meaning. Accordingly, in the following sections outlining the facts and procedure, we have explained and resolved some differences in the use of terminology where appropriate in order to allow

for a better understanding of the relevant facts and to properly analyze the issues raised in this case.

## A. Condition of Gas

The parties appear to argue about the physical condition of the gas at the well. However, a stipulation contained in the jury instructions reveals that the parties actually agree on the physical condition of the gas, but disagree about the terminology used to describe the gas. Thus, we briefly review the parties' use of the differing terminology and explain how the stipulation indicates that the parties are actually in agreement about the physical condition of the gas.

According to the lessors, when the gas emerges from the well it is "raw gas," meaning to the lessors that it is not in a condition to meet the specifications of the interstate pipeline. The lessors further argue that the gas at the well is at a low pressure (from 15 to 250 pounds per square inch gauge (psig)), and is water-saturated, with 40 pounds of water per million cubic feet (mmcf). The lessors contend that in order for the gas to meet the interstate pipeline specifications, the gas must be "treated," specifically, compressed and dehydrated. To do so, the gas enters a gathering system, a set of low pressure pipes which gathers gas from various wells and moves it to the main line. The gathering system collects gas, which is then compressed from low pressure gas to high

---

1. There are four types of lease language at issue in this case. Type I provides that "lessee shall pay to lessor a sum equal to one-eighth (1/8th) of the gross proceeds received from the sale of such produced substances where the same is sold at the mouth of the well or, if not sold at the mouth of the well, then one-eighth (1/8th) of the market value thereof at the mouth of the well, but in no event more than one-eighths of the actual amount received by the lessee for the sale thereof." Type II provides that "lessee shall pay lessor as royalty, ⅛ of the proceeds from the sale of gas as such at the mouth of the well where gas, condensate, distillate or other gaseous substance is found." Type III provides that the lessee "pay lessor for gas of whatsoever nature or kind produced and sold, or used off the premises, or used in the manufacture of any products therefrom, one-eighth, at the market price at the well for the gas sold, used off the premises, or in the manufacture of products therefrom." Type IV provides that the lessee "pay one-eighth (⅛) of the proceeds received for gas sold from each well

where gas only is found, or the market value at the well of such gas used off the premises, and lessor to have gas free of cost from any well for all stoves and all inside lights in the principal dwelling house on such land during the same time by making his own connections with the well at his own risk and expense."

2. The "at the well" and "at the mouth of the well" language found in the four lease types is at issue in this case. We recognize that there may be differences in the use of these phrases under some circumstances. However, for purposes of ease in reading comprehension, we have used the phrase "at the well" in this opinion to refer to both "at the well" leases and "at the mouth of the well" leases. Thus, our use of "at the well" language in various places in this opinion without the use of "at the mouth of the well" language does not reflect any intention to distinguish the phrases.

pressure gas, sufficient to meet the specifications of the interstate pipeline. The lessors argue that in addition to being compressed, the gas must also travel through a dehydrator, which removes water vapor from the gas in order to meet interstate pipeline specifications. Finally, the lessors suggest that after being dehydrated, the gas is then ready to enter the interstate pipeline.

Although the lessees agree that the gas must be gathered, compressed, and dehydrated before the gas can enter the interstate pipeline, they disagree with the description of the physical condition of the gas as it emerges from the well. The lessees argue that the natural gas at issue is almost pure methane and directly usable in its natural state at the well. Instead of being raw, as the lessors contend, the lessees argue that the gas is dry, that is, virtually free of liquid hydrocarbons, and sweet, that is, free of chemical impurities, such as hydrogen sulfide and other sulphur compounds, when it emerges from the well. Further, the lessees argue that the gas is directly usable at the well both commercially and domestically, and does not require any processing in order to be used. Finally, the lessees emphasize that the gas has been used in its natural state from the well for many years, both by local consumers and by the lessors in lieu of royalty payments.

According to a stipulation by the parties in Jury Instruction 4, the parties agree that the gas at issue is predominantly free of hydrogen sulfide[3] and carbon dioxide. Sweet gas is defined as "[n]atural gas not contaminated with impurities, such as sulphur compounds. Except for removal of any liquid constituents that may be present, sweet gas is ready for commercial and domestic use." 8 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law: Manual of Terms*, 1064 (2000) [hereinafter *Oil and Gas Terms*]. Moreover, the parties agree that some of the gas has been used directly from the wells by the lessors as part of the lease agreements. Accordingly, based on the definition of sweet gas, the use of the gas at the well by the lessors, and the parties' agreement that the gas is predomi-

nantly free of hydrogen sulfide, we interpret the parties' stipulation to mean that the parties agree that the gas is sweet gas. Likewise, the parties do not actually disagree that the gas is dry when it emerges from the well. Instead, the parties disagree about the purpose of the dehydration of the gas. Specifically, the lessors suggest that dehydration is necessary in order for the gas to be marketable, and thus, to enter the pipeline. The lessees' view, however, is that dehydration is only required for transportation of marketable gas away from the well.

Dehydration involves the removal of water from fluid produced from wells. *Oil and Gas Terms, supra,* at 260. The parties agree that the gas in this case is dehydrated after compression to remove liquid prior to the gas entering the interstate pipeline. The parties also agree that the gas is usable by the lessors directly from the well, without requiring any liquid removing processes to be completed prior to the use of the gas. Thus, the parties, through their arguments, agree that the gas is dry when it emerges from the well, irrespective of their disagreement about the purpose of the dehydration process.

Finally, notwithstanding the parties' use of differing terminology to describe the physical condition of the gas, the parties agree that the gas must be gathered, compressed, and dehydrated in order to enter the interstate pipeline. Thus, the actual dispute raised in this case is whether the gas is marketable at the well prior to gathering, compressing, and dehydration, or marketable after these processes have been completed and the gas is ready to enter the interstate pipeline. Since we believe that the parties agree that the gas is both sweet and dry, we will analyze this case with the understanding that the gas here is sweet and dry as it emerges from the well.

### B. How the Gas Moves from the Wellhead to the Pipeline

There are numerous gas purchase contracts and gathering, dehydration, and compression contracts that were submitted as exhibits in this case. The gas purchase con-

---

**3.** Hydrogen sulfide is "an odorous compound found in sour gas." 8 Howard R. Williams &

Charles J. Meyers, *Oil and Gas Law: Manual of Terms,* 495 (2000).

tracts provide specific details for the purchase of the gas both at the well and away from the well. The gathering, compression, and dehydration contracts provide for agreements regarding how the gas is to be processed. Some of these contracts also contain provisions for the sale of the gas after these processes have been completed. The various contracts provide specific details regarding how the gas is processed, including details regarding quantity, price, purity, heating value, and temperature requirements for the gas. The contracts provide the framework for how the gas moves through the system from the well, through processing, and eventually to the interstate pipeline.[4]

It appears that initially most of the contracts, which were executed in the 1970's between the lessees and the gas companies that bought the gas, provided for the gas to be sold at the wellhead, with the buyer of the gas undertaking the performance of the gathering, compression, and dehydration necessary for the gas to subsequently enter the pipeline. In general, the purchaser of this gas was also the company that transported the gas through the pipeline. In the late 1980's and early 1990's, a number of the contracts were amended to provide for sale of the gas away from the well, in addition to continued provisions for the sale of the gas at the well. In general, these amended contracts provided for an alternate point of sale, usually directly to an interconnection point of a gathering system and the buyer's pipeline. Under these amendments, the gas was sold to the buyer, with the point of delivery being a gathering system, instead of at the well. The amendments resulted in the buyer contracting with another company, usually Yuma Gathering System, who would perform gathering, compression, and dehydration of the gas, and transport the processed gas directly to the buyer at the interstate pipeline.

Finally, the record reflects other contracts which were entered into between the lessees and Yuma Gathering System, which provided for the sale of gas directly to Yuma Gathering System. Under these contracts, Yuma Gathering System would receive the gas directly from the lessees, process the gas, and subsequently sell the gas to a third party at the interstate pipeline.

### C. Payment of Royalties

The royalties on the gas sold were computed in two ways based on where the gas was sold.[5] For gas sold at the wells, the lessors were paid royalties based on a percentage (1/8th) of the proceeds received by the lessees for the sale of the gas. For these royalties, the lessors contend that the royalty payments were improper because the gas was not marketable at the well, and therefore, should not have been sold at the well. As such, the lessors argue that the royalties they received for these sales were much lower than the royalties they would have received had the gas been sold away from the wells.

The lessors also argue that the sales made at the well were not arms-length transactions by the lessees, and that the purchasers of the gas, who subsequently sold the gas downstream at the interstate pipeline for a higher price, were closely linked with the lessees. Accordingly, the lessors contend that these transactions were improper and constituted a breach of the duty to market the gas. The lessees argue, however, that the royalties paid on the gas sold at the well were properly paid because the gas was marketable at the well, and the royalties were calculated using the gross proceeds received by the lessees for those sales.

For the gas sold away from the wells, the lessors were paid royalties based on the price of the gas sold minus deductions for the cost

---

4. Many of the gas purchase contracts and gathering, dehydration, and compression contracts submitted as exhibits at trial provided for the gas to be delivered into either the Williams Natural Gas Company pipeline or the KN Energy, Inc. pipeline, both interstate pipelines. Some of the contracts submitted as exhibits, however, provide for delivery only into the KN Energy, Inc. pipeline. Because our analysis does not require that we

distinguish between the two pipelines, we will refer to them both as "the pipeline" or "the interstate pipeline."

5. Gas obtained from direct connections to the wellhead and used by the lessors for their own purposes was accepted as an "in kind" royalty payment, and is not in dispute in this case.

of gathering, compression, and dehydration. The lessors argue that these deductions were improper and that their royalties should have been paid based on one-eighth (1/8th) of the proceeds received from the sale of the gas, with no deductions for gathering, compression, and dehydration. The lessors suggest that these costs are required in order to place the gas in a marketable condition, and therefore, these costs should be borne solely by the lessees. The lessees label the method of calculation of these royalties the "work-back" or "net-back" method.

Under the work-back method, "costs of transportation, processing and treatment are deducted from the ultimate proceeds of sale of the oil or gas and any extracted or processed products to ascertain wellhead value." *Oil and Gas Terms, supra,* at 1188. According to the lessees, the royalty calculations were made by deducting the "reasonable transportation related costs" from the price obtained for the gas at the interstate pipeline after it had been gathered, compressed, and dehydrated. The lessees contend that these expenses were properly deductible, since the gas was marketable at the well and these "transportation" expenses served only to increase the value of an already marketable product. Moreover, the lessees argue that since the royalties under the leases were to be paid based on the value "at the well," the work-back calculation was the appropriate method to determine the amount of the royalty payments under the leases.

### D. Trial Court Proceedings

The lessors claim that the lessees engaged in improper practices by: (1) taking deductions from royalties for costs such as gathering, dehydration, and compression; and (2) selling the gas to an affiliate at less than arms length and/or selling the gas at an artificially low price.

After various pre-trial motions filed by the parties, this case went to trial and was heard by a jury. Prior to trial, the trial court made rulings on issues based on pre-trial motions which were relevant to the ultimate decision rendered by the jury. First, the trial court determined that the leases were silent regarding allocation of costs, and therefore, no testimony or evidence should be presented to the jury regarding the lease language.[6] Second, the trial court concluded that *Garman v. Conoco,* 886 P.2d 652 (Colo.1994), required that the implied covenant to market supercedes the "at the well" lease language for purposes of determining the allocation of costs. Based on this ruling and the trial court's determination that marketability was a question of fact, the trial court concluded that it was up to the jury to determine whether the gas was in a marketable condition when it was sold at the well and away from the well.

The trial court's instruction to the jury[7] regarding marketability stated that gas was fit for sale when it was free from impurities and would be taken by a purchaser, and when the lessees had acted in good faith. Using this instruction, the jury found that the gas sold at the well was marketable at the well, and thus the royalty payments made based on those sales were proper. The jury additionally found that the gas sold away from the well was not marketable at the well, and thus, the lessees improperly deducted costs from the royalty payments. The jury based this finding on its determination that, with respect to gas sold away from the well, gathering, compression, transportation, and dehydration were all required in order for the gas to be in a marketable condition.

Both parties appealed. On appeal, the lessees argued that the trial court erred in not giving effect to the lease language because the "at the well" and "at the mouth of the well" lease language determined the point of valuation for royalty payments, and was therefore sufficient to determine the allocation of costs. The lessees further argued that the jury instruction regarding marketability was erroneous because it included a good faith assessment and resulted in an

---

**6.** Although no testimony or evidence was allowed at trial regarding the lease language, the actual leases were available to the jury during deliberations.

**7.** The full text of the jury instruction at issue is found in section II.D. at footnote 22.

incorrect jury verdict finding that the gas sold away from the well was not marketable at the well. On cross-appeal, the lessors argued that the trial court erred in failing to grant their motion for judgment notwithstanding the verdict with respect to sales of gas at the well. The lessors argued that because the gas had not been gathered, dehydrated, and compressed at the well before the sale, the gas was not marketable at the well. The lessors further argued that because the gas was not marketable at the well, and because it was sold before it was marketable, the royalty payments for gas sold at the well were artificially low.

## E. Court of Appeals' Decision

On appeal, the court of appeals first determined that some meaning must be given to those provisions in the leases containing the "at the well" or "at the mouth of the well" language. *Rogers v. Westerman Farm Co.*, 986 P.2d 967, 972 (Colo.App.1998). The court of appeals held that the "at the well" language established the point of valuation. *Id.* Thus, the court of appeals concluded that because the point of valuation was at the wellhead, the lease language confirmed the traditional rule that transportation costs to transport the gas away from the wellhead are to be shared between the lessors and the lessees. *Id.* The court of appeals also concluded that although the language at issue established how transportation costs were to be allocated, the language did not specifically allocate other costs. Instead, the court of appeals held, that with the exception of transportation costs, the leases were silent with respect to the allocation of costs. *Id.* In light of the leases' silence, the court of appeals concluded that the trial court had not committed error in prohibiting reference to the leases at trial. *Id.* at 972–73. The court further explained that the leases' silence as to costs other than transportation costs did not mean that the lessees bore all such costs. Rather, the court of appeals concluded that the allocation of costs is controlled by a determination of when the gas is marketable. *Id.* at 973.

The court of appeals next considered the trial court's gas marketability jury instruc-

tion. After discussing the conclusion that the sole issue to be decided in determining marketability is whether the product is sufficiently free from impurities that it will be taken by a purchaser, the court of appeals determined that the trial court erred in including a good faith assessment in the instruction. *Id.* The court of appeals reasoned that a lessee's good or bad faith is a separate issue from the determination of whether a product is marketable, because marketability turns solely on the condition of the product. Ultimately, however, the court of appeals concluded that although the trial court's jury instruction was erroneous, the fact that the gas was actually sold at the well showed that it was marketable there, and, as such, the instruction was not prejudicial to either party. *Id.* at 974. Furthermore, the court of appeals held that because the instruction required the jury to consider whether the lessees were acting in good faith, the jury's finding that royalty payments made for sales at the well was not improper, and, therefore, must have entailed a determination that the lessees acted in good faith with respect to those sales. *Id.*

Relying on a commentator's article, the court of appeals determined that the gas was in a marketable condition at the wellhead. *Id.* at 974–75. Accordingly, the court of appeals concluded that the trial court erred in submitting the issue of marketability for gas sold away from the well to the jury. In its analysis, the court of appeals concluded that the gas was marketable based on its condition, and that the costs deducted by the lessees were for transportation of the product. Therefore, the court of appeals held that, as a matter of law, the lessees properly deducted costs before making royalty payments for gas sold away from the well. *Id.* at 975. Accordingly, the court of appeals held that the judgment against the lessees for the deduction of costs must be reversed. *Id.*

Both parties petitioned for a writ of certiorari to the court of appeals. The lessors raised three issues: (1) whether the court of appeals erred in reversing the jury's verdict that the gas sold away from the well was not marketable at the well; (2) whether the court of appeals erred in holding that costs in-

curred after the gas was removed from the well were deductible as a matter of law; and (3) whether the court of appeals erred in holding that the gas was marketable at the well as a matter of law. The lessees raised one issue, whether the "at the well" or "at the mouth of the well" lease language is silent regarding how royalties are to be calculated and paid.

## II. ANALYSIS

Our analysis of this case begins with a discussion of the "at the well" and "at the mouth of the well" lease language in dispute here. We review the language of each of the four lease types and conclude that the "at the well" language is silent with respect to allocation of costs. We next review the "at the well" language to determine if, at a minimum, it addresses the allocation of transportation costs. We conclude that it does not. Instead, in order to determine allocation of costs where the lease language is silent, we must look to the implied covenant to market, and thus, whether the gas is marketable.

After determining that the lease language is silent, and thus, the implied covenant to market controls, we next discuss our previous holding in *Garman v. Conoco*, 886 P.2d 652 (Colo.1994). In *Garman*, we held that where a lease is silent as to allocation of costs, the implied covenant to market obligates the lessee to incur costs necessary to render the gas marketable. *Id.* at 654, 659. In *Garman*, however, we did not discuss or apply a workable definition of marketability. Thus, we do so here, using *Garman* as a

framework, and looking to the first-marketable product rule as guidance only in shaping our definition of marketability.

Finally, we review the court of appeals' analysis of the jury instruction regarding marketability. We agree with the court of appeals that the trial court's instruction to the jury was erroneous. However, we disagree with the court of appeals that such error was not prejudicial, and instead conclude that the jury instruction resulted in substantial and prejudicial error, requiring reversal and a new trial. Finally, we disagree with the court of appeals' determination that the gas was marketable as a matter of law, and instead confirm our view that marketability is a question of fact.

### A. Leases and the Allocation of Costs

This court granted certiorari on four issues raised by the parties below.[8] Our analysis requires us to answer the question raised in the cross-petition for certiorari first, specifically, whether the leases at issue are silent with respect to how royalties are to be paid.

In order to resolve the dispute among the parties here, we must look to the actual language of the leases at issue and determine if they address the allocation of costs, and thus, the calculation of royalty payments. We first note that there are four variations of lease language at issue in this case. However, notwithstanding the distinct language of each of the four lease types, there is some language common to all four lease types. Specifically, all of the leases contemplate that the royalties are to be computed "at the well"

---

**8.** The four issues that we granted certiorari on are:

1. Whether the court of appeals contradicted this court's decision in *Garman v. Conoco*, 886 P.2d 652 (Colo.1994), in reversing a jury's verdict that the natural gas which the defendant-lessees sold at the interconnect with the interstate pipeline was not in a marketable condition at the well, and that gathering, compression, and dehydration were necessary to transform such gas into a marketable product.

2. Whether the court of appeals contradicted this court's decision in *Garman v. Conoco*, 886 P.2d 652 (Colo.1994), in holding as a matter of law that the post-production costs which the defendant-lessees incurred to convert raw gas into a condition which meets interstate pipe-

line specifications were not incurred to transform the raw gas into a marketable product.

3. Whether the court of appeals contradicted this court's decision in *Garman v. Conoco*, 886 P.2d 652 (Colo.1994), in holding that raw gas produced at the surface and sold to a gathering company at the well was in a marketable condition at the well, prior to being gathered, compressed, and dehydrated to meet the specifications of the interstate pipelines which delivered the gas to the market in which it was sold.

4. Whether the court of appeals erred in concluding that the language of the royalty clauses in the leases was silent on how royalties are to be calculated and paid, and thus erred in applying *Garman v. Conoco*, 886 P.2d 652 (Colo. 1994), to reverse the district court's judgment.

or "at the mouth of the well." [9] We have not previously interpreted the type of lease language presented by the leases at issue in this case. Despite the differing language in each of the four types of leases, and despite the arguments raised that the "at the well" and "at the mouth of the well" language provides for the allocation of costs, we conclude that all of the leases are, in fact, silent with respect to the allocation of costs.

The parties argue that the "at the well" lease language is determinative of the allocation of costs. Specifically, the lessees collectively argue that "at the well" or "at the mouth of the well" establishes a geographical point of valuation for determining royalty payments. As such, the lessees argue that costs incurred with respect to the processing of the gas after that point are to be shared by the lessors and lessees. The lessors, however, do not agree. For example, at least one of the lessors argues that our decision in *Garman* determined that "at the well" language is silent with respect to allocation of costs. We reject both parties' arguments.

Notwithstanding an initial misleading appearance that the lease language provides for allocation of costs, it is apparent that when scrutinized in depth, each lease clause provision inadequately addresses allocation of costs. For example, the Type I lease contains two separate clauses. The first clause provides for royalties based on the gross proceeds from the sale of gas at the wellhead. Assuming a commonly understood definition of "gross proceeds," this language seemingly suggests that costs would not be shared.[10] For example, gross proceeds means "the total monies and other consideration accruing to an oil and gas lessee for the disposition of the oil." *Oil and Gas Terms, supra,* at 472; *see also Mittelstaedt v. Santa Fe Minerals, Inc.,* 954 P.2d 1203, 1206 (Okla.

1998)(plain meaning of "gross proceeds" suggests payment to lessor is without deductions). Moreover, the second clause further confuses the meaning of the lease language as a whole. This clause provides that, for sales not occurring at the well, the royalties are to be paid based on the market value at the well, but in no event shall those royalties total more than 1/8th of the amount actually received for the sale. While this portion of the lease suggests that the royalties be paid based on the market value, there is no indication as to how such value is to be determined. Furthermore, this language does not indicate whether the calculation of market value at the well includes or excludes costs, and does not describe how those costs should be allocated, if at all, between the parties. Thus, because the lease language fails to even describe either the costs or the allowable deductions, it is silent with respect to all deductions.

Similarly, the Type II lease provides that the royalties are to be calculated based on "the proceeds from the sale of gas ... at the mouth of the well." Commentators have suggested that a proceeds clause must either specify the place where proceeds are to be calculated, or the expenses which can be deducted. 3 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law* § 646.1, at 608.4–608.6 (2000)[hereinafter Williams & Meyers]. Assuming this position is adopted, this lease language indicates that the royalties are to be paid based on sales at the physical location of the well. However, this is not the only view. The Arkansas Supreme Court, for example, has held that "proceeds at the well" means gross proceeds where the lease does not refer to costs or use the term "net proceeds." *Hanna Oil & Gas Co., v. Taylor,* 297 Ark. 80, 759 S.W.2d 563, 564–65 (1988). Thus, there is uncertainty as to how

---

**9.** The parties have not argued that the four different lease types at issue require different interpretations or analysis.

**10.** However, some jurisdictions have interpreted the phrase "gross proceeds at the well" to mean that royalties are to be calculated based on sales price minus post-production costs. *Schroeder v. Terra Energy, Ltd.,* 223 Mich.App. 176, 565 N.W.2d 887, 891, 894 (1997)("gross proceeds at the well" contemplates the deduction of post-

production costs from the sale price of the gas, based on the view that at the well refers to location for royalty valuation purposes); *see also* 3 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law* § 645.2, at 597–98(2000)("A royalty or other nonoperating interest in production is usually subject to a proportionate share of the costs incurred subsequent to production where the royalty or nonoperating interest is payable 'at the well.' ")

royalties should be calculated under this language. Moreover, this language does not provide any guidance in calculating a royalty payment for gas sold anywhere other than at the physical location of the well. Accordingly, this lease language not only fails to allocate costs between the parties, it fails to address costs in any sense.

Likewise, the Type III lease provides that the royalties are to be paid based on the "market price at the well for the gas sold." While the term "market price" suggests the actual price for which gas is purchased and sold, commentators and courts have also used the term interchangeably with "market value." *Oil and Gas Terms, supra,* at 605–606. For gas actually sold at the well, this language might suggest that the royalty payments should be equal to the actual price received when the gas is sold, without any deductions for costs. Assuming, under the language in this type of lease, that the gas is sold at the well, there may be no costs to be allocated because this language only contemplates a sale at the physical location of the wellhead. However, because the sale of gas anywhere other than at the wellhead is not even contemplated by this language, this provision is surely silent with respect to any gas sold away from the well.

Finally, the Type IV lease provides that royalties are to be calculated based on the "proceeds received for gas sold from each well ... or the market value at the well of such gas used off the premises." The first portion of this language regarding proceeds is unclear as to whether it is intended to refer to proceeds from the sale at the location of the well, or proceeds from the sale at the place of sale, if other than at the physical location of the well. In a proceeds type lease, the instrument should specify either the place where royalties are to be calculated, or the expenses to which the lessor is subject. 3 Williams & Meyers, *supra,* § 646.1, at 608.4–628.6. Thus, differing interpretations of this language are possible because the intended meaning of this clause is unclear.

Furthermore, the reference to a calculation based on market value of gas used off the premises does not clearly establish whether such a calculation would apply to gas sold off the premises. The use of the word "or" in the lease implies that there is a distinction between the calculation for gas sold from the physical location of a well and gas used off the premises. Neither phrase, referring to proceeds for gas sold at the well, or market value at the well for gas used off the premises, indicates whether there was an intent to allocate costs between the parties, nor whether deductions would be made prior to calculating royalties. Thus, like the other three types of leases, the Type IV lease language is also silent as to cost allocation.

■ Our view that the leases are silent with respect to the allocation of costs is further solidified by the notion in contract law that language should be construed as a whole, and specific phrases or terms should not be interpreted in isolation. *Simon v. Shelter Gen. Ins. Co.,* 842 P.2d 236, 239 (Colo.1992); *Kuta v. Joint Dist. No. 50(J),* 799 P.2d 379, 382 (Colo.1990). Specifically with respect to oil and gas leases, "a royalty clause should be construed in its entirety and against the party who offered it, and in light of the fact that the royalty clause is the means by which the lessor receives the primary consideration for a productive lease." Owen L. Anderson, *Royalty Valuation: Should Royalty Obligations Be Determined Intrinsically, Theoretically, or Realistically, Part 2 (Should Courts Contemplate the Forest or Dissect Each Tree?),* 37 Nat. Resources J. 611, 636 (1997)[hereinafter Anderson, Part 2]. The parties argue that the "at the well" and "at the mouth of the well" language at issue in this case is meaningful in allocating costs between the lessees and lessors. However, as we have discussed, this language in isolation is actually silent with respect to those costs. Moreover, the lease language contained in the rest of the contracts does not shed any light onto how, or even whether, this phrase was intended to address the allocation of costs.

Although courts and commentators have disagreed over whether "at the well" language addresses allocation of costs,[11] other

---

11. The Tenth Circuit has even noted that the

phrase "at the mouth of the well" either "ex-

jurisdictions have acknowledged that "at the well" lease language is silent as to allocation of costs. For example, in *Fox Wood III v. TXO Production Corp.*, 854 P.2d 880 (Okla. 1992), the Oklahoma Supreme Court implicitly determined that "at the well" language in a lease was silent regarding allocation of costs. Although the Oklahoma Supreme Court did not explicitly state that the lease provision was silent, it did conclude that, without an agreement that the lessee and lessor would share costs, the lessor could not be required to bear compression costs. *Id.* at 881.

Although Anderson does not necessarily agree with the view that "at the well" language is silent with respect to allocation of costs, he does suggest that this language is sufficiently unclear that it may or may not accomplish the lessees' objectives, to share proportionately in costs, when read together with the royalty clause as a whole. *See* Anderson, Part 2, *supra*, at 635. Moreover, Anderson has suggested that lessees, in order to avoid alerting lessors of their motives, have intentionally used "at the well" language to avoid directly stating their objectives in sharing costs. *See id.* In a similar view, the Kansas Supreme Court, in *Gilmore v. Superior Oil Co.*, implicitly suggested that a lease containing "at the well" language was ambiguous, and as such, should be construed in favor of the lessor and against the lessee. 192 Kan. 388, 388 P.2d 602, 605 (1964).

In a subsequent case, the Kansas Supreme Court adopted the position that "at the well" lease language may be silent as to post-production cost deductions. Specifically, in *Sternberger v. Marathon Oil Co.*, the Kansas Supreme Court found that a lease directing

royalty payments of "one-eighth (⅛) of the market price at the well for gas sold or used" was silent with respect to deductions. 257 Kan. 315, 894 P.2d 788, 794 (1995). Despite the conclusion that the lease was silent as to deductions, however, the Kansas Supreme Court concluded that the lease was not ambiguous, and that the language at issue specifically provided the point of valuation for the royalty payments. *Id.* at 794–95. Because that court concluded that the royalty valuation point was at the physical location of the well, it further concluded that both lessees and lessors were responsible for their proportionate shares of costs to transport the gas away from the well location to the market.[12] *Id.* at 799–800. In the case before us, the court of appeals arrived at the same conclusion. The court of appeals held that the "at the well" provisions must be given some meaning, particularly with respect to transportation costs, but that the same language is silent with respect to allocation of other costs. *Rogers*, 986 P.2d at 972–73. We disagree with this interpretation.

■ The court of appeals' interpretation does not acknowledge that the "at the well" and "at the mouth of the well" language has greater implications than the limited significance of a mere determination of a location for royalty valuation purposes. Thus, attempting to give such limited significance to "at the well" language requires assumptions to be made about the nature of the costs involved.[13] Specifically, the suggestion that "at the well" language allocates transportation costs, without allocating other costs, attempts to give limited significance to that phrase, without acknowledging that transportation costs often include other costs.

---

pressly contemplates a transportation deduction, or is silent on the issue." *Atl. Richfield Co. v. Farm Credit Bank*, 226 F.3d 1138, 1150 (10th Cir.2000).

**12.** This conclusion is apparently limited to circumstances where the gas is marketable at the physical location of the well. It is unclear, however, whether under this analysis, transportation costs would be shared proportionately if the gas were not marketable at the physical location of the well. Without explaining why, the court in *Sternberger* asserted that the gas was marketable at the well. 894 P.2d at 799–800. Because the gas was marketable at the well, and because

there was no market at the well, the court concluded that transportation costs to the point of sale must be borne proportionately between the lessee and the lessor. *Id.*

**13.** For example, the parties in this case dispute whether the costs were for transportation of a marketable product or were costs associated with making the gas marketable. Thus, whether the costs are to be allocated between the parties should not be determined solely by the label attached to the costs. Instead, the actual purpose of the costs should be determinative of whether they are properly deductible from royalty payments.

Accordingly, "at the well" language cannot adequately address the allocation of transportation costs without also addressing other costs associated with transporting gas. The cost of gathering, compression, and dehydration should be included, because they may all be necessary to physically transport the gas. Thus, it is inconsistent to carve out a rule for transportation costs alone. In addition, we conclude that it is also inconsistent to carve out a rule for different types of transportation costs. Whether transportation costs are incurred to transport the gas for a short distance or to a distant market is irrelevant in determining whether those costs should be allocated between the lessors and the lessees. Instead, the determination of whether transportation costs (either short or long distance) are to be allocated between the parties is based on whether the gas is marketable before or after the transportation cost are incurred.

Gas marketability must be addressed first, together with the function of the actual costs incurred. It must be determined whether those actual costs stem from the transportation of a marketable product, or whether they were costs incurred to make the product marketable. Therefore, we decline to adopt the view that "at the well" or "at the mouth of the well" language determines the allocation of transportation costs, but is silent with respect to all other costs. This view is both internally inconsistent and inconsistent with our view that the implied covenant to market controls the allocation of costs under circumstances where lease language fails to address cost allocation.

Moreover, by holding that "at the well" allocates transportation costs, the court of appeals does not acknowledge that the general rule regarding transportation costs assumes that gas is marketable as it emerges from the wellhead. Instead, the court of appeals essentially adopts the rule that, as a matter of law, transportation costs are deductible.[14]

■ The general rule that transportation costs are allocated between the two parties after the gas is marketable is really part of a much broader rule. That broader rule holds that costs incurred after a marketable product has been obtained, that either enhance the value of the product or cause the product to be transported to another location, are shared by the lessee and the lessor. 3 Eugene Kuntz, *A Treatise on the Law of Oil and Gas*, § 40.5, at 351 (1989 & 2001 Supp.)[hereinafter Kuntz]. Accordingly, the analysis of whether transportation costs are deductible begs the question of when the gas is marketable.

■ If gas is marketable at the physical location of the well, then transportation costs may be shared between the lessee and the lessor. However, if gas is not marketable at the physical location of the well, either because it is not in a marketable condition, or because it is not acceptable for a commercial market, then the lessee has not met its burden of making the gas marketable. Thus, transportation costs may not be deducted from royalty payments. Adopting the view that the "at the well" language determines which costs are deductible from royalty payments fails to acknowledge that deductibility of costs is determined by whether gas is marketable, not by the physical location of the gas or the condition of the

14. The transportation rule, as discussed in *Johnson v. Jernigan*, was based on the Oklahoma Supreme Court's interpretation of lease language providing that the royalty payment was 1/8th of the "gross proceeds at the prevailing market rate for all gas sold off the premises." 475 P.2d 396, 397 (Okla.1970). In interpreting the lease, that court determined that the market rate was to be calculated based on gas sold near or at the well, that there would be a market rate in existence at the location of the well, and that the lease did not contemplate the gas being sold off the premises. *Id.* at 398–400. In other words, the Oklahoma Supreme Court looked at the lease language to determine a valuation point, the location where the gas was to be valued. Because the gas was made available for market at the wellhead, or on the lease property, any costs to transport the gas to a pipeline for sale were held to be allocated between the parties. Thus, the Oklahoma Supreme Court ultimately held that transportation costs incurred to transport the gas away from the leased property were properly deducted from royalty payments. *Id.* at 399–400. In its holding, the Oklahoma Supreme Court noted that the type of costs involved, the cost of transportation away from the leased property, were different in nature from the costs of care and preparation for delivery of the gas. *Id.* at 400.

gas. Accordingly, we decline to hold here that transportation costs are deductible from royalty payments as a matter of law when a lease includes "at the well" language.

Other jurisdictions have given differing views of the meaning of "at the well" language, and have found that instead of being silent, that language is sufficient to allocate costs. Specifically, in *Piney Woods Country Life School v. Shell Oil Co.,* the Fifth Circuit concluded that "at the well" describes both location (place of sale) and quality of gas for the purpose of determining royalty calculations. 726 F.2d 225, 231, 240 (5th Cir.1984)(interpreting Mississippi oil and gas leases). Thus, based on the determination that production ends when gas is severed from the earth, and that the lessee's duty to produce gas has then been satisfied, the Fifth Circuit held that expenses incurred after production may be charged against a royalty computed at the well. *Id.* at 240. Therefore, that court held that both transportation costs and other processing costs may properly be deducted from royalty payments because the royalty valuation point was at the location of the well and was based on the quality of the gas at the well. *Id.*

Similarly, the Michigan Court of Appeals concluded that "at the well" language "refers to proceeds minus refining and transportation costs, as opposed to proceeds at the point of sale, where refining and transportation costs are not deducted." *Schroeder v. Terra Energy, Ltd.,* 223 Mich.App. 176, 565 N.W.2d 887, 893 (1997). However, even the Michigan Court of Appeals acknowledged that it "is unclear why the parties would choose to use the language 'at the wellhead' to allocate post-production costs rather than just stating expressly the allocation of such costs." *Id.* at 894.

Likewise, Texas law supports the view that "at the well" establishes the point of valuation at the physical location at the mouth of the well. *Martin v. Glass,* 571 F.Supp. 1406, 1411 (N.D.Tex.1983). In *Martin,* the court concluded that under Texas law, post-production costs are properly deducted from royalty payments under an "at the well" lease. *Id.* at 1411–16. That court further concluded that because gas is "produced" when it is severed at the wellhead, and the lessee's duty to market gas ends when gas is produced, the compression costs at issue were incurred subsequent to production, and thus, were properly deductible from royalty payments as post-production costs. *Id.* at 1415–17; *see also Judice v. Mewbourne Oil Co.,* 939 S.W.2d 133, 136 (Tex.1996)("Value at the well means the value of the gas before it has been compressed and before other value is added in preparing and transporting the gas to market.").

We disagree, however, with these jurisdictions because they fail to recognize that the implied covenant to market controls the lessee's duty to make the gas marketable. Instead, these jurisdictions have adopted the rule that the lessee's duty has ended once gas is severed from the wellhead, and thus, any costs incurred subsequent to that physical removal are to be shared by the parties. In Colorado, we decline to follow the rule that gas is "produced" once physically severed, and thus, decline to adopt the reasoning regarding the deductibility of costs adopted by these jurisdictions. *See Garman,* 886 P.2d at 657–61. However, notwithstanding the fact that we may be in the minority of states adopting this approach, we believe that it is the more sound analysis, and that it is consistent with our jurisprudence.

■ Finally, in interpreting leases like those in this case, we are mindful of the generally accepted rule that oil and gas leases are strictly construed against the lessee in favor of the lessor. *Wilson v. Wakefield,* 146 Kan. 693, 72 P.2d 978, 980 (1937); *Ladd v. Upham,* 58 S.W.2d 1037, 1039 (Tex.Civ.App. 1933); *Davis v. Cramer,* 837 P.2d 218, 225 (Colo.App.1992)(oil and gas leases are construed liberally in favor of lessor and strictly against lessee); *Hill v. Stanolind Oil & Gas Co.,* 119 Colo. 477, 489, 205 P.2d 643, 649 (1949)(doubt as to contract's meaning should be resolved against the one who prepared it); Anderson, Part 2, *supra,* at 636 ("an oil and gas lease offered by a lessee should be construed against the lessee"); 2 W.L. Summers, *The Law of Oil and Gas* § 372, at 487–94 (1959 & 2000 Supp.)[hereinafter Summers](uncertainty or ambiguity as to meaning of contract will be construed against par-

ty who prepared the contract; in oil and gas industry that is usually the lessee). This rule is generally based on the recognition that the bargaining power between a lessor and lessee is similar to that historically found between an insurance company and its customers. *Ladd,* 58 S.W.2d at 1039. Thus, the parties are in similar unequal positions. For example, lessors are not usually familiar with the law related to oil and gas leases, while lessees, through experience drafting and litigating leases, generally are. *Id.; see also West v. Alpar Res., Inc.,* 298 N.W.2d 484, 490–91 (N.D.1980)(failure to expressly provide for deductions of expenses in ambiguous lease language will result in disallowance of such deductions because lease must be construed strongly against lessee).

Accordingly, based on our interpretation of the "at the well" and "at the mouth of the well" language common to the four lease types at issue, we conclude that the leases in this case are silent with respect to allocation of costs. We disagree with those jurisdictions that conclude that "at the well" is sufficient to allocate costs. Moreover, we disagree with the conclusion that "at the well" language addresses transportation costs, while not addressing other costs incurred in processing the gas. Instead, we conclude that because the leases are silent, we must look to the implied covenant to market, and our previous decision in *Garman v. Conoco,* to determine the proper allocation of costs.

### B. Garman v. Conoco, Its Limitations, and the Implied Covenant to Market

Having concluded that the leases at issue in this case are silent with respect to the allocation of costs, we look to the implied covenant to market found in every oil and gas lease. Thus, our analysis is guided by

our prior decision in *Garman v. Conoco,* where we addressed the application of the implied covenant to market to determine how to properly allocate costs. 886 P.2d 652 (Colo.1994). We begin by reviewing our holding in *Garman,* and discuss its limitations. Finally, we conclude that the issues raised here necessitate further analysis of the lessee's duty to market, and specifically, require a determination of how marketability is to be defined for purposes of application of the implied covenant to market.

In *Garman,* we answered a certified question from the U.S. District Court that asked, "Under Colorado law, is the owner of an overriding royalty interest in gas production required to bear a proportionate share of post-production costs, such as processing, transportation, and compression, when the assignment creating the overriding royalty interest is silent as to how post-production costs are to be borne?" *Id.* at 653. In our analysis, we made the assumption that the assignment creating the overriding royalty interest at issue was silent as to the allocation of post-production costs.[15] *Id.* at 654. Based on that assumption and looking to Kansas and Oklahoma case law for guidance, we determined that where a lease clause is silent as to the allocation of post-production costs, the implied covenant to market must be considered in determining the rights and obligations of the parties. *Id.* at 658–59. Under Colorado law, the duty to market is a covenant contained in every oil and gas lease. *Id.* at 659 n. 21. We concluded that in Colorado, "the implied covenant to market obligates the lessee to incur those post-production costs necessary to place gas in a condition acceptable for market. Overriding royalty interest owners [16] are not obligated to share in these costs." *Id.* at 659.

15. This assumption was based on the question posed by the U.S. District Court, and the request by the parties to consider the issue based on general principles of oil and gas terms. Accordingly, the specific terms of the assignment at issue in *Garman* were not analyzed in that decision.

16. Some jurisdictions have suggested that the implied covenant to market should not be extended from royalty interest owners to overriding royalty interest owners. *See XAE Corp. v. SMR*

*Prop. Mgmt. Co.,* 968 P.2d 1201 (Okla.1998)(holding that implied covenant to market not applicable to overriding royalty interest owners where interest was an in-kind interest deliverable to the wellhead). However, in *Garman,* we concluded that the implied covenant to market extends to both royalty interest owners and overriding royalty interest owners since the rationale for application of the covenant applies equally to both interests. 886 P.2d at 659–60. Thus, our analysis of the implied covenant to

■ In reaching our determination in *Garman,* we stated that our holding was "limited to those post-production costs required to transform raw gas into a marketable product." 886 P.2d at 660. In other words, the lessees were not allowed to deduct production costs required to make the gas marketable from the royalty payments. Instead, because the lessees had a duty to make the product marketable, they alone must bear any expenses incurred in order for the gas to reach that marketable condition. We also determined, however, that in those circumstances where the gas was marketable, and subsequent production costs were incurred to enhance the value of the already marketable gas, such subsequent costs may be shared by the lessors and lessees provided that certain conditions are met. *Id.* at 661. Specifically, under these circumstances, the lessee has the burden to show that such costs were reasonable, and that the actual royalty revenues increased proportionately to the costs assessed against the royalties. *Id.*

Our decision in *Garman* was limited in two ways. First, our ruling in that case *only* applied to leases that were silent with respect to the allocation of production costs. We determined that because the leases were silent on that issue, the implied covenant to market requires that the lessee produce gas and incur those expenses necessary to place gas in a condition acceptable for market. Second, we set forth criteria to assess whether the deduction of production costs from the royalty payments was appropriate, but *only* with respect to those production costs incurred after the gas was already marketable. Nowhere in *Garman* did we actually define marketable condition. The case before us, however, presents us with an opportunity to define marketability.

Our decision in *Garman* provides a framework for analysis of the issues presented in this case. However, further development regarding the concept of marketability is necessary in order to understand how costs are to be allocated in accordance with the implied covenant to market. Moreover, marketabili-

ty must be defined in order to resolve this case and provide guidance to lower courts confronted with litigation addressing these issues. Accordingly, we next discuss how marketability is defined, and thus, how costs are to be allocated under the implied covenant to market.

### C. Marketability and the Allocation of Costs

In order to resolve the dispute between the parties in this case, we must define marketability under Colorado law, and specifically under the implied duty to market found in every oil and gas lease. The court of appeals determined that marketability referred solely to the condition of the gas. Although the court of appeals was not without support in reaching this conclusion, we disagree with this analysis. Instead, we believe that the more accurate definition of marketability includes both a reference to the physical condition of the gas, as well as the ability for the gas to be sold in a commercial marketplace.

■ In Colorado, "we have recognized four implied covenants in oil and gas leases: to drill; to develop after discovery of oil and gas in paying quantities; to operate diligently and prudently; and to protect leased premises against drainage." *Garman,* 886 P.2d at 659. "Embodied in the covenant to operate diligently and prudently is the implied covenant to market." *Davis v. Cramer,* 808 P.2d 358, 361 (Colo.1991). The covenant requires that the lessee exercise reasonable diligence to market the products, defined as "whatever, in the circumstances, would be reasonably expected of all operators of ordinary prudence, having regard to the interests of both lessor and lessee." *Id.* at 363.

Among the facts and circumstances which are to be considered in the determination of the lessee's diligence in marketing are, the availability of marketing facilities, such as pipe lines and the efforts of the lessee in securing the extension of pipelines into the field; the pressure and quality of gas as affecting its marketability; the cost of pumping oil, the amount produced, and the

market and the determination as to when gas is marketable applies equally to both the royalty interest owners and the overriding royalty inter-

est owners in this case. We note that the parties do not argue that the two interests should be treated differently.

prevailing market price therefor; and the time and manner of the performance of such acts as might result in marketing. 2 Summers, *supra,* § 415 at 634.

 In determining whether a lessee has met the obligations imposed by the implied duty to market, we look to the nature of the lessee's duty to market, and, implicitly, how a determination of marketability is made. In a footnote in *Garman,* we referred to two definitions of marketable condition. We said that "marketable means 'fit to be offered for sale in a market; being such as may be justly and lawfully bought or sold ... wanted by purchasers.'" *Garman,* 886 P.2d at 660 n. 26 (quoting *Webster's 3rd New International Dictionary* 1383 (1986)). We next stated that "Williams and Meyers define marketable condition as gas 'sufficiently free from impurities that it will be taken by a purchaser.'" *Garman,* 886 P.2d at 660 n. 26 (quoting 8 Williams & Meyers at 692). Although seemingly helpful, those definitions were not incorporated into our discussion in *Garman* in defining the lessee's duty under the implied covenant to market, nor did we explain the meaning of those broad definitions. Certainly, these definitions could be interpreted as supporting our view here that in order to be marketable, gas must be in a certain physical condition, as well as being fit for sale in a commercial market. Accordingly, we consider these definitions consistent with our holding in this case. However, in order to fully understand the concept of marketability, we must go beyond those definitions.

 We believe that the theory of the first-marketable product is helpful in guiding our definition of marketability, and what is meant by gas being in a marketable condition. Thus, in defining marketability, we look to the first-marketable product rule for guidance, but do not adopt it in its entirety.[17] The first-marketable product rule states that "the point where a marketable product is first obtained is the logical point where the exploration and production segment of the oil and gas industry ends, is the point where the primary objective of the lease contract is achieved, and therefore is the logical point for the calculation of royalty."[18] Anderson, Part 2, *supra,* at 637. Thus, this rule provides that royalty calculations should be made at the point where a first-marketable product has been obtained. *Id.* at 639–40. Under this theory, "the point at which gas first becomes a marketable product would be established on the basis of a known and real market."[19] *Id.* at 640–41. "Production," and thus, the lessee's duty to produce a marketable product, would end when a first-marketable product has in fact been obtained. *Id.* at 642. Thus, depending on the factual scenario, "production" could end at the point of extraction, or elsewhere. *Id.*

There is a distinction between acts which constitute production and acts which constitute processing and refining of gas extracted

---

17. We note that Anderson's article is limited to a discussion of fee lease royalty clauses. Anderson, Part 2, *supra,* at 670. However, as indicated in footnote 16, we believe that the implied covenant to market applies equally to both royalty interest owners and overriding royalty interest owners. Thus, our use of the first-marketable product rule as guidance in defining marketability does not apply solely to royalty calculations for royalty interest owners.

18. Although Anderson argues that there is no need to resort to the implied covenant to market in adopting the first-marketable product rule, we disagree. Anderson, Part 2, *supra,* at 684. Instead, we conclude that under circumstances such as those presented here where there are no express provisions contemplating allocation of costs with respect to royalty calculations, the implied covenant to market is implicated. Moreover, in order to understand the lessee's duties under the implied covenant to market, and thus, the allowable deductions from royalty payments, it must be determined what is required in attaining a marketable product.

19. The first-marketable product rule determines the point of marketability and the allocation of costs without requiring a "work-back method" of royalty calculation. The work-back valuation method is "a method for calculating market value of oil or gas at the wellhead when value cannot be calculated on the basis of comparable sales. Under this method [work-back valuation method], costs of transportation, processing and treatment are deducted from the ultimate proceeds of sale of the oil or gas and any extracted or processed products to ascertain wellhead value." *Oil and Gas Terms, supra,* at 1188. Anderson argues that while many courts have adopted the work-back method of royalty calculation, this method does not sufficiently reflect actual sales in an actual market. Anderson, Part 2, *supra,* at 638–39, 646–47.

by production. 3 Kuntz, *supra*, § 40.5 at 351.

Unquestionably, under most leases, the lessee must bear all costs of production. There is, however, no reason to impose on the lessee the costs of refining or processing the product, unless an intention to do so is revealed by the lease. It is submitted that acts which constitute production have not ceased until a marketable product has been obtained. After a marketable product has been obtained, then further costs in improving or transporting such product should be shared by the lessor and lessee if royalty gas is delivered in kind, or such costs should be taken into account in determining market value if royalty is paid in money.

*Id.*

▪ In looking to the first-marketable product rule for guidance in defining marketability, we must look to the practical implications of such a rule. In defining whether gas is marketable, there are two factors to consider, condition and location.[20] First, we must look to whether the gas is in a marketable condition, that is, in the physical condition where it is acceptable to be bought and sold in a commercial marketplace. Second, we must look to location, that is, the commercial marketplace, to determine whether the gas is commercially saleable in the oil and gas marketplace.

▪ A market is a "[p]lace of commercial activity in which goods, commodities, securities, services, etc., are bought and sold." *Black's Law Dictionary* 970 (6th ed.1990). It is also defined as "[t]he region in which any commodity or product can be sold; the geographical or economic extent of commercial demand." *Id.* Thus, the determination of when gas is first-marketable is driven in part

by the commercial realities of the marketplace. *See* Anderson, Part 2, *supra*, at 637 n. 112 (recognizing that a lease is a commercial transaction between lessee, as merchant, and lessor, as nonmerchant, and should be viewed based on commercial realities in the marketplace).

It may be, for all intents and purposes, that gas has reached the first-marketable product status when it is in the physical condition and location to enter the pipeline. *See TXO Prod. Corp.*, 903 P.2d at 262–63 (implying that the standard for determining when gas is marketable is when it is fit to enter the pipeline, because costs of dehydration and gathering, which are required in order for the gas to enter the pipeline, are expenses borne by the lessee as part of the duty to market gas, and are not deductible expenses from royalty payments); *R.E. Yarbrough & Co.*, 122 IBLA 217, 223 (1992)(gas not in marketable condition until prepared for delivery into pipeline); Wyo. Stat. § 30–5–304 (2000)(lessee pays all non-deductible costs of production including costs of gathering, compressing, dehydrating, and transporting the gas into the market pipeline); Jay G. Martin, *Summary of Significant Gas Market and Transportation Changes Affecting Producers in the 1990's*, 37 Rocky Mtn. Min. L. Inst. § 16.01 (1991)(production function of gas industry includes producer being responsible for "putting the gas into a marketable state by removing its impurities and gathering the gas from the various points of production (wellhead), and delivering it via gathering lines to a common point for delivery into the large diameter transmission lines").

▪ Finally, the determination of marketability is a question of fact .[21] Anderson,

---

**20.** Anderson alludes to the possibility that both marketable condition and marketable location may be required in order to obtain a first-marketable product. See Anderson, Part 2, supra, at 634. However, Anderson also, in giving meaning to "at the well" language, indicates that transportation costs to a distant market are properly deductible from royalty payments. Id. at 640.

**21.** We note that some jurisdictions that recognize the implied covenant to market have seemingly

held that certain costs are not deductible as a matter of law. *See Gilmore v. Superior Oil Co.*, 192 Kan. 388, 388 P.2d 602, 606–07 (1964)(compression costs not deductible because required to make gas marketable); *TXO Prod. Corp. v. Oklahoma*, 903 P.2d 259, 262–63 (Okla.1994)(dehydration and gathering costs not deductible because required to make gas marketable). We disagree that certain costs are deductible in calculating royalties as a matter of law because this view fails to recognize that similar types of costs may be deductible under some circumstances

Part 2, *supra*, at 642; *see also Garman*, 886 P.2d at 661 n. 28 (a determination of whether lessee diligent in marketing efforts is question of fact). "Sans factual inquiry, it is impossible to determine the very existence of a market." *Mittelstaedt*, 954 P.2d at 1214 (Opala, J., dissenting). "Treating marketability as a question of law ignores market realities." *Id.*

We recognize that pursuant to the first-marketable product rule, as explained by Anderson, transportation costs to a distant market are to be shared proportionately between the lessors and lessees. This allocation of transportation costs is consistent with the view the "at the well" language must be given some meaning. However, we have concluded that the "at the well" lease language in this case is silent as to allocation of all costs, including transportation costs. Under these circumstances, the logic of the first-marketable product rule requires that the allocation of all costs be determined based on when the gas is marketable. Thus, we decline to single out transportation costs and treat them differently than other costs.

█ In sum, in defining marketability under the implied covenant to market, we look to the first-marketable product rule for guidance. Gas is marketable when it is in the physical condition such that it is acceptable to be bought and sold in a commercial marketplace, and in the location of a commercial marketplace, such that it is commercially saleable in the oil and gas marketplace. The determination of whether gas is marketable is a question of fact, to be resolved by a fact finder.

█ Once gas is deemed marketable based on a factual determination, the allocation of all costs can properly be determined. Absent express lease provisions addressing allocation of costs, the lessee's duty to mar-

ket requires that the lessee bear the expenses incurred in obtaining a marketable product. Thus, the expense of getting the product to a marketable condition and location are borne by the lessee. Once a product is marketable, however, additional costs incurred to either improve the product, or transport the product, are to be shared proportionately by the lessor and lessee. All costs must be reasonable.

The following section addresses the jury instructions given in this case in light of our definition of marketability. In looking to our definition of marketability, the issue is raised by the trial court's instruction to the jury as to whether the determination of marketability also includes a consideration of the lessees' conduct. Thus, we also address this issue in our analysis of the jury instructions given in this case.

### D. Jury Instruction Regarding Marketability

We have defined marketability as requiring that the gas be in a physical condition acceptable to be exchanged in a commercial market, and also in a location, the commercial marketplace, where the gas is commercially saleable. Here, we consider the jury instructions given by the trial court, and the court of appeals' analysis of those instructions, including the portion of the instruction related to the lessors' claims of bad faith by the lessees. We review the instructions to determine whether the trial court adequately instructed the jury on the issue of marketability. We conclude that it did not. We commence our discussion of the jury instructions with the court of appeals' conclusions.

The court of appeals analyzed the issue of marketability based on the jury instruction given by the trial court.[22] The court of ap-

---

and not deductible under other circumstances. *See Fox Wood III v. TXO Prod. Corp.*, 854 P.2d 880, 883 (Okla.1992)(Opala, C.J., dissenting)(arguing that general rule that compression costs are not deductible because part of lessee's duty to market improperly burdens lessee with all compression costs, including post-production compression costs). Instead, we believe that the determination of whether gas is in a marketable condition, and thus, whether a lessee has satisfied the duty to market, is a question of fact.

**22.** Jury Instruction 13 stated: "The gas in this case is marketable when it is fit to be offered for sale in a market. It is fit to be offered for sale when it (a) is sufficiently free from impurities that it will be taken by a purchaser and (b) may be justly and lawfully bought and sold. It may be justly and lawfully bought and sold by the defendants herein (a) when they are acting in good faith and dealing fairly on behalf of themselves and the plaintiffs, and (b) when they are

peals held that the jury instruction was erroneous, because it concluded that under *Garman,* marketability is to be determined solely based on the condition of the gas. *Rogers,* 986 P.2d at 973. Because the jury instruction included a reference to the good faith of the lessee, and to whether the actions of the parties were consistent with their reasonable expectations under the lease, the court of appeals concluded that it was in error. Accordingly, the court of appeals concluded that the instruction was erroneous because it combined the two issues related to marketability for consideration by the jury. *Id.*

Notwithstanding its finding of error, however, the court of appeals considered the effect of this error on the lessors' claims. The court of appeals concluded that, with respect to sales at the wellhead, the erroneous instruction did not prejudice either party for two reasons. *Id.* at 974. First, the court of appeals reasoned that the lessors had not raised a valid claim that the gas was not marketable at the well because some of the gas was actually sold at the well. Thus, the court of appeals concluded that because the gas was sold, it must be marketable. *Id.*

Second, the court of appeals concluded that the only valid claim that the lessors could assert with respect to sales at the well was that the lessees acted unreasonably or in bad faith in selling the gas at the well. Thus, the court of appeals suggested that the jury, by determining that the gas was marketable at the well based on the instruction given, implicitly found that the lessees had acted reasonably and in good faith. Thus, the court of appeals concluded that the instruction was not prejudicial to either party. *Id.*

With respect to sales away from the well, however, the court of appeals determined that there was a more fundamental defect than the jury instruction itself. The court of appeals held that the trial court erred in submitting the issue of whether the gas was in a marketable condition to the jury with respect to sales away from the well, because the court of appeals concluded that the gas was marketable at the well as a matter of

law. *Id.* Therefore, the court of appeals concluded that, because the gas was marketable at the well, all costs incurred subsequently were transportation costs, and thus, were deductible as a matter of law. Accordingly, the court of appeals held that because there was no issue of fact to be resolved, this question should not have been submitted to the jury. *Id.* at 974–75.

We first address the court of appeals' conclusion that the gas was marketable at the well as a matter of law, and thus, its determination that the marketability issue should not have been submitted to the jury with respect to gas sold away from the well. We disagree with the court of appeals, and conclude that the court of appeals erred in several aspects of this holding. First, we disagree with the court of appeals' conclusion that the gas was marketable as a matter of law. As we have previously stated, the question of marketability is one of fact, not law. *Garman,* 886 P.2d at 661 n. 28; Anderson, Part 2, *supra,* at 642. Thus, we disagree with the court of appeals' further conclusion that the costs at issue were properly deducted from the royalty calculations as a matter of law. Moreover, we hold that because the issue of whether gas is marketable is a factual inquiry, it was properly submitted to the jury.

Second, we disagree with the court of appeals' application of the first-marketable product theory. While it is true that Anderson suggests that the costs of compression should not always be borne by the lessee, and that transportation costs to a distant market should be shared by the lessor and the lessee, we have concluded, and Anderson agrees, that whether costs are deductible is based on whether a first-marketable product has been obtained, not on the label associated with any particular cost. *See* Anderson, Part 2, *supra,* at 640, 668–69, 682. Moreover, Anderson indicates that the determination of when gas is first-marketable is a question of fact, not a question of law, as suggested by the court of appeals. *Id.* at 642. Likewise, The dissent in *Mittelstaedt* advocates that Oklahoma should adopt the first-marketable

acting in such a manner that the defendants and plaintiffs will attain their reasonable expectations

under their leases."

product rule. *Mittelstaedt,* 954 P.2d at 1211 (Opala, J., dissenting), not a rule that suggests that certain costs are deductible as a matter of law. Thus, we disagree with the court of appeals' application of the first-marketable product rule and the inconsistent conclusion that certain costs are deductible as a matter of law.

Finally, the court of appeals concluded that the gas was marketable at the physical location of the well, and as such, all costs incurred subsequently should be shared by the lessee and lessor. Such a conclusion was essentially an adoption of the reasoning followed in other states which contend that the point of marketability is at the physical location of the well. *See generally Martin v. Glass,* 571 F.Supp. 1406 (N.D.Tex.1983); *Merritt v. Southwestern Elec. Power Co.,* 499 So.2d 210 (La.Ct.App.1986). In *Garman,* we rejected those cases and declined to follow the reasoning therein. *Garman,* 886 P.2d at 659–61. We confirm our reasoning in *Garman* here with respect to that line of cases, and as such, suggest that the court of appeals should not have adopted those cases in support of its analysis.

■ Having confirmed that the issue of whether gas is marketable is a question of fact, and as such, was properly submitted to the jury with respect to all of the gas at issue in this case, we now analyze the actual instructions given to the jury regarding marketability. We first discuss the issue of whether the trial court's instruction to the jury was erroneous. The court of appeals suggested that the instruction was erroneous because it combined the issue of whether the gas was marketable with the issue of whether the lessees acted in good faith. We agree that this combination rendered the instruction erroneous.

■ Whether the lessees acted in bad faith is a separate issue from the determination of marketability for the purposes of determining allocation of costs and calculating royalty payments. An analysis of marketability allows for a determination of the proper allocation of costs, and thus, defines the calculation of royalty payments. In contrast, the bad faith of a lessee implicates the sale price of certain gas, either for less than it

was worth, or to a related party for an artificially low price. Thus, in determining whether a lessee acted in bad faith, the focus is on the sale price of the gas, and what a fair sale price would have been had the lessee acted in good faith. A bad faith claim raises the issue of improper receipt and distribution of royalty payments, not calculation of the allocation of costs. Thus, a bad faith claim does not implicate allocation of costs in the first instance. Instead, a bad faith claim raises the issue of determining what a fair price would have been had the gas been sold in good faith.

■ A lessee's duty of good faith and fair dealing in performance of an oil and gas lease has developed through the law of implied covenants arising from contract law in general. *See* 5 Williams & Meyers, *supra,* § 802.1, at 8–14. In Colorado, every contract contains an implied duty of good faith and fair dealing. *Amoco Oil Co. v. Ervin,* 908 P.2d 493, 498 (Colo.1995); *see also Farmers Group, Inc., v. Trimble,* 691 P.2d 1138, 1141 (Colo.1984)(insurer has duty to act in good faith and fair dealing under implied covenant in insurance contract). As previously noted, with respect to oil and gas leases, Colorado has adopted a prudent-operator standard for analysis of performance of implied lease covenants. *Mountain States Oil Corp. v. Sandoval,* 109 Colo. 401, 125 P.2d 964 (1942); 5 Williams & Meyers, *supra,* § 806.3, at 37.

Regardless of the characterization of the lessee's duty as one requiring good faith and fair dealing, or acting as a prudent operator, analysis of the lessee's duty in either context relates to whether the lessee has breached that duty. *See Davis v. Cramer,* 808 P.2d 358, 363 (Colo.1991)(discussing that the implied covenant to market requires the lessee to act with reasonable diligence, and remanding the case to the court of appeals for determination of whether covenant was breached by lessee). The issue that we are faced with on certiorari is not whether the lessees breached an implied covenant to market with respect to their conduct in selling the gas, and not whether the jury instruction was adequate with respect to any potential

breach of duty. Rather, the issue here is whether the jury instruction adequately defined marketability, in order for the jury to determine whether the gas was, in fact, marketable, and ultimately for the jury to determine the proper royalty calculations.

As we have discussed, the determination of whether gas is marketable is a question of fact, and must be determined based on a condition and location in a commercial market. The commercial market and the condition of the gas dictates the marketability of the gas, not the independent actions of a particular lessee.

Thus, under the circumstances where bad faith of a lessee is at issue, it should be addressed and instructed separately from the issue of whether the gas is marketable.[23] In the event a jury found that a lessee had acted in bad faith, the focus would then become what a fair market price for the gas would have been, and also what the payment to the lessors should have been, had the lessee acted in good faith. The issue of proper allocation of costs is not implicated under the circumstances where bad faith of a lessee is raised. Thus, any bad faith issues regarding the lessees' conduct are separate and distinct from the issue of where and when the gas was marketable, and therefore, should not have been included in the jury instruction given in this case related to marketability. Instead, issues related to the bad faith of the lessees should have been addressed and instructed separately.[24]

▬▬▬ We conclude that the instructions were erroneous for other reasons as well. Under Colorado law, all of the trial court's instructions are to be considered as a whole when determining whether the necessary law has been properly stated to the jury. *Montgomery Ward & Co. v. Kerns*, 172 Colo. 59, 63, 470 P.2d 34, 36–37 (1970). However, the

form and style of the instructions is within the trial court's discretion. *Id.* at 63–64, 470 P.2d at 37. "A judgment will not be reversed for refusal of the trial court to give requested instructions where there was not resulting substantial, prejudicial error." *Armentrout v. FMC Corp.*, 842 P.2d 175, 186 (Colo.1992). Review of the language of the jury instruction regarding marketability, in conjunction with the other instructions related to marketability, reveals that the jury was not properly instructed as to the necessary law.

The language of the jury instruction at issue required the jury to evaluate marketability based on the condition of the gas.[25] The instruction stated that gas is marketable when it is fit to be offered for sale in a market. It defines "fit to be offered for sale" by indicating that it must be sufficiently free from impurities that it will be taken by a purchaser, and that it may be justly and lawfully bought and sold. The justly and lawfully bought and sold requirement looks to the actions of the lessees, and requires that they act in good faith and fair dealing, and in a manner so as to satisfy the lessors' reasonable expectations under the lease (hereinafter the good faith requirement).

▬▬ When read carefully, it becomes clear that the instruction requests the jury to consider whether the gas is marketable based on the condition that it be taken by a purchaser. This language suggests that a single purchaser may be sufficient to establish that the gas is marketable. This suggestion is further solidified by the inclusion of the good faith requirement in the instruction. The good faith requirement suggests that as long as the lessees find a purchaser, and act in good faith and fair dealing in selling the gas to such a purchaser, that the gas is marketable. Under this instruction, it ap-

---

**23.** We note that the issues of whether the gas was marketable, and whether the lessees acted in bad faith were pleaded in the alternative, and thus, were alternative theories of the case. However, the instruction regarding marketability combined the two theories and included them as both being factors in assessing marketability, a combination which no doubt confused the jury.

**24.** Whether there were sufficient facts alleged and proven in order for the lessors to sustain a claim of bad faith is not before us, and we express no opinion about these issues.

**25.** We do not believe that the instruction required the jury to solely consider the physical condition of the gas. Although we note that if it had, such an instruction would also be erroneous.

pears that any purchaser will suffice, so long as the purchase agreement was made in good faith by the lessees. Thus, this instruction erroneously requires the jury to consider whether the gas is marketable based on whether a single purchaser exists, and whether the lessees acted in good faith in selling the gas to that purchaser.

Moreover, as we have discussed, the instruction erroneously requires the jury to consider whether the lessees acted in good faith in selecting a purchaser. This instruction is too narrowly tailored, and is limited to the actions of the lessees. It fails to address the broader concept of marketability. In other words, the instruction should have required the jury to analyze whether the gas was marketable by looking at more than just the sale of the gas by the lessees in this case. Whether the gas is marketable or not is a much broader question of fact, to be resolved based on whether there is a commercially viable market for the gas.

While we agree that a single purchaser, in a good faith purchase of gas, is evidence that there is a market for the gas, we do not agree that such a purchase conclusively establishes a market. The determination of whether a market exists is an issue of fact to be decided by a jury, based on the facts and circumstances, which may include factors other than a single purchase of gas. The jury instruction here erroneously implies that one sale to a purchaser in good faith establishes marketability. Instead, under our definition of marketability, the gas must be in such a physical condition and location that it is available for commercial exchange, in a viable market, i.e., a commercial marketplace. Moreover, if the instruction sufficiently advised the jury that in order to be marketable the gas must be available for sale in a commercial market, there would be no need for the good faith requirement. This is because the good faith notion is inherent in a commercial market. Thus, if the instruction were intended to define marketability in the context of a commercial market, the good faith requirement would be unnecessary.

The interpretation that the instruction at issue failed to adequately define marketability is further supported by looking at the other instructions given to the jury related to marketability. *See Montgomery Ward & Co.,* 172 Colo. at 63, 470 P.2d at 36–37. Specifically, Instruction 15 stated that "gas can be marketable at more than one point in the field and in the production and distribution process." In general, we agree that this is an accurate statement. However, this instruction, in combination with the marketability instruction providing that gas is marketable when it is in a condition that it will be taken by a purchaser, suggests to the jury that the gas is marketable anywhere and anytime it is sold to a purchaser at any point in the field or process.

Similarly, Instruction 17 provides that the jury, having heard evidence relating to both gas which was sold at the wells, and gas which was sold away from the wells, must apply the instructions to gas which has been sold in each place. By referring to gas being sold, this instruction, in combination with the others, suggests that gas may be marketable assuming it is sold to a purchaser in good faith. Gas is not marketable merely because it is sold. Moreover, this instruction further emphasizes that the single sale of gas at a particular location determines marketability. Thus, it adds to the notion that the jury was instructed that marketability can be established by a single sale to a purchaser in good faith. As we have discussed above, such a definition of marketability is erroneous. Accordingly, we conclude that the instruction was erroneous with respect to marketability and allocation of costs, and thus, the jury was not adequately instructed on the appropriate law.

Having found the instruction was erroneous, we next discuss whether such error was substantial and prejudicial. We disagree with the court of appeals that the error was not prejudicial. Instead, we conclude that the error was both substantial and prejudicial, and thus requires reversal.

We first address the court of appeals conclusion that the erroneous instruction was not prejudicial with respect to gas sold at the well because of the fact that the gas was sold meant that it was marketable. We disagree with this analysis. There is a difference

between marketing and selling a product. *California Co. v. Udall,* 296 F.2d 384, 388 (C.A.D.C.1961). For marketing, there must be a market, which has been defined as "an established demand for an identified product." *Id.* With respect to sales, "almost anything can be sold, if the price is no consideration." *Id.* In *Udall,* the court found that the record suggested that there was no market for the gas as it emerged from the well, but instead, the only market was for gas at a certain pressure, and certain minimum water and hydrocarbon content. *Id.* Thus, the gas must be more than merely sold in order for the lessee to meet the duty to market the gas. Instead, as previously discussed, the gas must meet the standard of being suitable for a commercial market.

> Marketability of the product may be affected because the quality of the raw gas is impaired by the presence of impurities. In this instance, it should be necessary to determine if there is a commercial market for the raw gas. If there is a commercial market, then a marketable product has been produced and further processing to improve the product should be treated as refining to increase the value of the marketable product. If there is no commercial market for the raw gas, the lessee's responsibilities theoretically have not ended, and the lessee should bear the costs of making the gas marketable.

3 Kuntz, *supra,* § 40.5 at 351. Moreover, as we have previously determined, marketability is a question of fact, not law. Thus, we disagree with the court of appeals' conclusion that the gas was marketable based solely on the fact that it was sold, and as such, disagree with the court of appeals' conclusion that the instruction was not prejudicial on this basis.

The court of appeals also concluded that the instruction was not prejudicial with respect to the sale of the gas at the well because under the good faith requirement of the instruction, the jury must have found that the lessees acted both reasonably and in good faith regarding those sales. Accordingly, the court of appeals concluded that there was no prejudice to either party resulting from the instruction. *Rogers,* 986 P.2d at 974. We agree with the court of appeals that the trial court erred in including the lessors' bad faith claim in the instruction regarding marketability. However, we disagree with the court of appeals that there was no prejudice to either party with respect to the bad faith claim regarding this instruction.

Although the instruction required the jury to consider the lessees' behavior in selling the gas, and make an assessment as to whether the lessees acted in good faith, it did not require the jury to consider the lessees' conduct apart from the issue of whether the gas was marketable. Instead, the marketability instruction combined the two claims, and thus, did not allow for either claim to be independently resolved by the jury. The jury was only allowed to consider the potential bad faith of the lessees in the context of whether the gas was marketable. As we have previously discussed, any claims of bad faith regarding the lessees' conduct are separate and distinct from the issue of whether the gas was marketable.

It is possible, as the court of appeals suggested, that by finding that the gas was marketable both at the well and away from the well, the jury may have found that the lessees had not acted in bad faith. However, because the instructions did not address the claims raised by the lessors separately, it may also be possible that the jury did not fully consider the lessees' conduct.

The language in the instruction did not refer to the claim that the gas was sold at an artificially low price, nor did it refer to the claim that the gas was sold to an affiliated purchaser. As such, it is unlikely that the jury considered whether the lessees acted in bad faith based on the actual allegations raised by the lessors in this litigation. Thus, the instruction was prejudicial and substantial with respect to the bad faith claim. Accordingly, we disagree with the court of appeals and conclude that the bad faith claim was not effectively resolved by the jury, since there was no separate instruction given to the jury addressing bad faith. Therefore, because the error in the jury instruction was both substantial and prejudicial with respect to the bad faith claim, the trial court judgment must be reversed.

In addition, we believe that the error created by the jury instruction with respect to allocation of costs was both substantial and prejudicial. First, the instruction confused two separate claims at issue in this case. As we explained above, the instruction erroneously combined the issue of whether the gas was marketable with the issue of whether the lessees acted in bad faith. Resolution of whether the gas is marketable leads to the determination of the proper allocation of costs for the purposes of calculating royalties. Alternatively, the determination of whether the lessees acted in bad faith looks at the particular conduct of the lessee and requires an assessment of what actions the lessee should have taken. The bad faith of a lessee does not determine allocation of costs for a royalty calculation. Thus, the combination of the two concepts led to confusion and misunderstanding by the jury regarding the determination of whether the gas was marketable,[26] and was therefore substantial and prejudicial error.

In addition, as we previously explained, the instructions as a whole focused the analysis of marketability on whether a single purchaser bought the gas in a good faith transaction,[27] not on whether there was a commercial market for the gas. Accordingly, the jury's determination of whether the gas was marketable was not based on correct law, and thus, resulted in inconsistent findings by the jury. The harm resulting from this instruction was both substantial, in that the jury reached two inconsistent conclusions, and prejudicial, in that it did not result in a determination of whether the gas was, in fact, marketable.

Moreover, the instructions, when reviewed as a whole, may explain why the jury found that the same gas was both marketable at the well, and not marketable at the well. It appears that the jury reached its verdict by determining that the gas was in the condition that it could be taken by a purchaser both at the well and away from the well, and that the lessees sold the gas in good faith at both of those points. Thus, under these instructions, it is understandable why the jury reached two apparently inconsistent results. Moreover, the instructions collectively indicate, and the inconsistent jury verdicts suggest, that the trial court essentially instructed the jury that a good faith purchaser was all that was needed to establish marketability as a matter of law. Because the error in the jury instructions was both substantial and prejudicial, the trial court judgment must be reversed, and this case remanded for a new trial on both the issue of allocation of costs and the issue of the alleged bad faith of the lessees.

### E. Conclusion

After assessing the "at the well" and "at the mouth of the well" language in this case, we conclude that the leases at issue here are silent with respect to the allocation of costs. Moreover, we decline to adopt the rule that the "at the well" language in the leases allocates transportation costs, while being silent as to other costs. Because we have determined that the leases are silent with respect to allocation of costs, we look to the implied covenant to market to determine the proper allocation of costs.

 Under the implied covenant to market, the lessees have a duty to make the gas marketable. In analyzing that duty, we look to the first-marketable product rule as guidance and adopt a definition of marketability to include both a physical condition such that the gas would be acceptable for sale in a commercial market, and a location-based assessment, such that it would be saleable in a commercial marketplace. The determination as to when gas is marketable is a question of fact. Once a determination is made that gas is marketable, costs can be allocated accord-

---

26. The jury's confusion is evidenced in part by the questions raised by the jury during deliberations. For example, the jury asked the trial court for a definition of marketable. The trial court replied that marketable was already defined in Jury Instruction 13, the instruction at issue in this case. The trial court declined to give any further direction to the jury on this issue.

27. Several of the tendered instructions offered by the parties, and rejected by the trial court, included language referring to purchasers and buyers, thereby expressing some recognition of the problem with the trial court's instructions referring to a single purchaser in good faith.

ingly. Costs incurred to make the gas marketable are to be borne solely by the lessees. Alternatively, costs incurred subsequent to the gas being marketable are to be shared proportionately between the lessee and the lessors. Finally, we decline to adopt the court of appeals' view that the gas was marketable as a matter of law, and that the costs were properly deductible by the lessees as a result of such a conclusion.

Ultimately, we conclude that because the trial court's instructions to the jury did not accurately and properly instruct the jury on the appropriate law to apply in determining marketability, the instructions were erroneous. Moreover, the error was both substantial and prejudicial. Therefore, we reverse the court of appeals' decision, and remand this case to the court of appeals for further proceedings consistent with this opinion. Specifically, upon retrial, the jury instructions on marketability should reflect the concept of marketability that we have outlined here. Further, the bad faith claim should be addressed and instructed separately from the gas marketability issue.