COLORADO COURT OF APPEALS
 2016 COA 39
 
 

Court of Appeals No. 14CA2502
Garfield County District Court No. 06CV317 
Honorable Denise K. Lynch, Judge

Ivo Lindauer; Sidney Lindauer; Ruth Lindauer; and Diamond Minerals, LLC, on behalf of themselves and all others similarly situated,
Plaintiffs-Appellees, 
v.
Williams Production RMT Company, n/k/a WPX Energy Rocky Mountain, LLC, 
Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS
Division VII
Opinion by JUDGE RICHMAN
Berger and Rothenberg*, JJ., concur
Announced March 10, 2016

Dufford, Waldeck, Milburn & Krohn, LLP, Nathan A. Keever, Grand Junction, Colorado, for Plaintiffs-Appellees
Holland & Hart LLP, John F. Shepherd, Christopher A. Chrisman, Denver, Colorado, for Defendant-Appellant
*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2015.
 
¶1       This case raises two undecided questions of Colorado law regarding the payment of royalties to lessors of oil and gas leases. First, must costs incurred to transport natural gas to markets beyond the first commercial market "enhance" the value of that gas, such that actual royalty revenues increase, in order to be deductible from royalty payments? Second, if the enhancement test applies to such transportation costs, must the enhancement, and the reasonableness of the costs, be shown on a month by month basis? We answer the first question "no" and therefore do not reach the second question.
¶2       Defendant, Williams Production RMT Company n/k/a WPX Energy Rocky Mountain, LLC (WPX), appeals the district court’s entry of judgment after a bench trial in favor of plaintiffs, Ivo Lindauer, Sydney Lindauer, Ruth Lindauer, Diamond Minerals, LLC, and all those similarly situated. We reverse and remand with directions to enter judgment in favor of WPX.
I. Background
¶3       Plaintiffs (the lessors) own royalty interests under oil and gas leases for wells operated by WPX (the lessee) in northwest Colorado. They brought this class action in 2006 challenging WPX’s calculation and payment of royalties.
¶4       The parties reached a partial settlement agreement in 2008 that resolved all but two reserved claims. Only the second claim is before us in this appeal, namely, plaintiffs’ assertion that WPX improperly deducted transportation costs incurred beyond the first commercial market when calculating royalties on natural gas in certain months from July 2000 to July 2008.[1]
¶5       The facts underlying this claim are largely undisputed. The natural gas on the lands subject to plaintiffs’ leases was produced in an area known as the Piceance Basin. WPX incurred costs to transport the natural gas from the wellhead to the point of sale. These included costs for compressing the gas, gathering it through small pipelines, and processing it at a plant. Once processed, the gas reached the "tailgate" of the processing plant and entered a large mainline pipeline. The costs of processing and transporting the gas up to the point it reached the tailgate are not deducted from royalties paid to plaintiffs.
¶6       Although there is a commercial market for gas at or near the tailgate in the Piceance Basin, WPX has sold some of the produced gas in "downstream" markets where higher prices are sometimes available. The gas sold downstream must be transported to the point of sale. WPX entered into long-term contracts with pipeline companies to reserve capacity on the mainline pipelines to transport the gas from the tailgate to the downstream markets.
¶7       The downstream transportation charges involve two components. First, there is a "demand charge," which is a charge paid by WPX to reserve space on the mainline pipelines. The demand charge is paid by WPX whether or not it uses the pipeline to ship gas, but according to WPX’s procedures, demand charges are deducted from plaintiffs’ royalties only in months where gas is shipped. The second component is a "commodity charge," which is paid by WPX per unit volume actually shipped on the pipeline. WPX deducts these commodity charges from the revenues before paying royalties to plaintiffs.
¶8       It is undisputed in this appeal that plaintiffs’ leases are silent regarding the allocation of transportation costs. Accordingly, the parties agree that the framework set forth in Garman v. Conoco, Inc., 886 P.2d 652, 661 (Colo. 1994), and Rogers v. Westerman Farm Co., 29 P.3d 887, 903 (Colo. 2001), governs this issue. The parties also agree that the tailgate of the processing plant is the first commercial market for the gas and that transportation costs incurred before that point are not deductible from royalty payments under that framework. At issue in this case are the costs incurred to transport the gas to downstream markets beyond the first commercial market.
¶9       Relying on both Garman and Rogers, plaintiffs contend that costs incurred to transport gas downstream are deductible only if WPX can show that (1) the costs are reasonable and (2) actual royalty revenues increase in proportion with the costs assessed against the royalties ("enhancement"). Plaintiffs do not contest the reasonableness of the amounts of the transportation costs (the first element), but they dispute whether actual royalty revenues increased in proportion to those costs (the second element). 
¶10       Specifically, plaintiffs argue that WPX must show enhancement on a month by month basis by comparing the downstream prices at the point of sale to the price of gas in the Piceance Basin. They argue that transportation costs are not deductible during any given month in which the additional transportation costs exceed any increase in royalty revenue achieved from selling the gas downstream.
¶11       WPX contends that the enhancement test does not apply to costs incurred to transport the gas to downstream markets. Alternatively, WPX argues that, even if the enhancement test applies, it must be determined based on the "prudent operator rule" rather than a month by month price comparison. According to WPX, the court should consider the overall reasonableness of WPX’s decisions to enter into long-term transportation contracts, as well as the long-term benefits to royalty owners such as plaintiffs as a result of WPX’s downstream marketing strategy.
¶12       The district court issued two written orders before trial resolving these legal issues in favor of plaintiffs. The court agreed with plaintiffs that the enhancement test applied to the costs of transporting the gas beyond the first commercial market. It interpreted Garman and Rogers to require that all costs incurred after the gas becomes marketable meet the enhancement test in order to be deducted from royalty payments. Accordingly, the court ruled that WPX bore the burden of proving that its transportation costs were reasonable and resulted in an actual increase in royalty revenues.
¶13       In its second order, the district court required that WPX apply the enhancement test on a month by month basis to determine whether its transportation costs were deductible. The court relied heavily on section 34-60-118.5(2)(a), (2.3)(h), (2.5), C.R.S. 2015, which requires lessees to pay royalties and report deductions on a monthly basis and provide a written explanation of those deductions upon request. The court rejected WPX’s contention that the enhancement test should be evaluated based on the prudent operator rule.
¶14       The court then held a bench trial to determine the only remaining issue — the price of gas at the first commercial market against which the downstream sales price would be compared. At the bench trial, WPX presented evidence that its downstream marketing strategy allowed it to substantially increase the volume of production from plaintiffs’ wells during the eight-year period at issue. WPX also maintained that, in many months, the increase in royalty revenue resulting from higher downstream prices exceeded the deduction for transportation costs, so that the overall revenues for the eight-year period as a whole were approximately $6,000,000 higher than if the gas had been sold at the tailgate market.
¶15       At the close of evidence, the district court, applying the enhancement rule, concluded that WPX did not establish enhancement in thirty-five months during the eight-year period, made factual findings on the price differentials in those months, and ordered a post-trial accounting. Based on that accounting, the court entered judgment against WPX for $5,136,296.95.
¶16       Neither party appeals the court’s findings regarding the prices of gas, or the post-trial accounting.
II. Discussion
¶17       WPX contends that the district court erred in ruling that (1) the enhancement test applies to post-marketability transportation costs and (2) the enhancement must be shown on a month by month basis by comparing prices in the first commercial market to the downstream sales price 
¶18       We agree with WPX that Garman and Rogers do not require post-marketability transportation costs to meet the enhancement test in order to be deducted from royalty payments and that other considerations militate against imposing an enhancement test on transportation costs. We conclude that post-marketability transportation costs are deductible if they are reasonable, and that lessees are not required to establish that such costs enhance the value of the gas or increase royalty revenues. Accordingly, we need not address whether the enhancement test must be applied on a month by month basis, but we do note that the statute on which the district court relied has no bearing on whether the enhancement test applies to the deductibility of post-marketability transportation costs.
A. Standard of Review
¶19       We review the district court’s interpretation of Colorado case law de novo. Gallegos v. Colo. Ground Water Comm’n, 147 P.3d 20, 28 (Colo. 2006).
B. Garman
 
¶20       The Colorado Supreme Court in Garman addressed a certified question from the federal court that asked whether post-production costs, such as processing, transportation, and compression, were deductible from royalty payments where the assignment creating the royalty interest was silent on the issue.2 886 P.2d at 653.
¶21       The supreme court held that, absent express language in the assignment, all costs incurred to make the gas marketable must be borne entirely by the lessee and are not deductible from royalty payments. Id. at 659, 661. In adopting this rule, the court relied on the "implied covenant to market" contained in every oil and gas lease. Id. at 659. The court explained that this covenant "obligates the lessee to engage in marketing efforts which ‘would be reasonably expected of all operators of ordinary prudence, having regard to the interests of both lessor and lessee.’" Id. (citation omitted). Applying this principle to the allocation of costs, the court held that "the implied covenant to market obligates the lessee to incur those post-production costs necessary to place gas in a condition acceptable for market," and that "[o]verriding royalty interest owners are not obligated to share in these costs." Id. The court relied on decisions from Kansas and Oklahoma that adopted similar rules based on the implied covenant to market. Id. at 658 (citing Gilmore v. Superior Oil Co., 388 P.2d 602, 606 (Kan. 1964); Wood v. TXO Prod. Corp., 854 P.2d 880, 882 (Okla. 1992)).
¶22       The supreme court in Garman also noted the basic difference between royalty owners (nonworking interest owners), who do not participate in decisions regarding operations and expenditures, and risk-bearing parties (working interest owners). Id. at 657, 660.
Normally, paying parties have the right to discuss proposed procedures and expenditures and ultimately have the right to disagree with the course of conduct selected by the operator.
Under the terms of a standard operating agreement[,] nonoperating working interest owners have the right to go "non-consent" on an operation and be subject to an agreed upon penalty. This right checks an operator’s unbridled ability to incur costs without full consideration of their economic effect. No such right exists for nonworking interest owners.
Id. at 660 (citation omitted).
¶23       Then the court addressed the allocation of costs after gas becomes marketable. The royalty owners in Garman conceded that (1) "the transportation costs associated with moving marketable gas from the tailgate of the processing plant where the gas enters the interstate pipeline to the point of sale are properly deductible"; and (2) "the costs incurred to process raw gas into its component parts after a marketable product has been obtained are generally deductible to the extent they are reasonable, provided such operations actually enhance the value of the product." Id. at 655 n.8.
¶24       Referencing these concessions, the court stated the rule that the parties in this case refer to as the enhancement test:
Upon obtaining a marketable product, any additional costs incurred to enhance the value of the marketable gas, such as those costs conceded by the [royalty owners], may be charged against nonworking interest owners. To the extent that certain processing costs enhance the value of an already marketable product the burden should be placed upon the lessee to show such costs are reasonable, and that actual royalty revenues increase in proportion with the costs assessed against the nonworking interest. We are not, however, called upon today to consider the reasonableness of [the lessee’s] expenses incurred to process, transport or compress already marketable gas.
Id. at 661 (emphasis added) (footnotes omitted).
¶25       Contrary to plaintiffs’ contention, Garman did not address whether post-marketability transportation costs are subject to the enhancement test. The first sentence quoted above referred merely to the general rule that post-marketability costs are deductible from royalty payments. Indeed, the footnote to that sentence in Garman quoted language from a treatise stating that "[a]fter a marketable product has been obtained, then further costs in improving or transporting such product should be shared by the lessor and lessee . . . ." Id. at 661 n.27 (quoting 3 Eugene Kuntz, A Treatise on the Law of Oil and Gas § 40.5 (1989 & 1994 Supp.)).
¶26       The italicized sentence in Garman is worthy of repetition. It states: "To the extent that certain processing costs enhance the value of an already marketable product the burden should be placed upon the lessee to show such costs are reasonable, and that actual royalty revenues increase in proportion with the costs assessed against the nonworking interest." Id. at 661.
¶27       In that sentence, the supreme court set out two requirements that lessees must meet to deduct a certain category of post-marketability costs, namely, "processing costs [that] enhance the value of an already marketable product." Id. (emphasis added). To deduct such costs, the lessee must show that (1) the costs are reasonable; and (2) actual royalty revenues increase in proportion with deducted costs. Id. Thus, the term "processing costs" and the two requirements for deducting those costs reflected the royalty owners’ concession in Garman that "the costs incurred to process raw gas into its component parts after a marketable product has been obtained are generally deductible to the extent they are reasonable, provided such operations actually enhance the value of the product." Id. at 655 n.8.
¶28       In this context, the term "processing costs" did not refer to the transportation costs incurred to move the gas from the first point of marketability to the actual point of sale, because the royalty owners in Garman conceded those transportation costs were deductible without any enhancement requirement. See id.
 
¶29       Indeed, the very next sentence of Garman referred to "expenses incurred to process, transport, or compress already marketable gas." Id. at 661. This language indicates that the supreme court treated processing and transportation costs as separate categories. Moreover, that sentence mentioned only the "reasonableness" requirement in connection with transportation costs. It did not state that such costs must also increase royalty revenues. Id.
 
¶30       Accordingly, we conclude that Garman did not expressly require post-marketability transportation costs to meet the enhancement test in order to be deductible.
C. Rogers
 
¶31       In Rogers the supreme court reaffirmed its holding in Garman and concluded that where a lease is silent on that issue, the implied covenant to market requires the lessee to bear all costs of obtaining a marketable product. 29 P.3d at 903, 906. In discussing Garman’s holding, the Rogers court stated:
We also determined [in Garman] . . . that in those circumstances where the gas was marketable, and subsequent production costs were incurred to enhance the value of the already marketable gas, such subsequent costs may be shared by the lessors and lessees provided that certain conditions are met.
Specifically, under these circumstances, the lessee has the burden to show that such costs were reasonable, and that the actual royalty revenues increased proportionately to the costs assessed against the royalties.
Id. at 903 (emphasis added) (citing Garman, 886 P.2d at 661).
¶32       Contrary to plaintiffs’ contention and the district court’s interpretation, Rogers did not expressly state that the enhancement test applies to all post-marketability costs, but instead referred specifically to "production costs" incurred to enhance the value of marketable gas. Id. Although Rogers did not define the term "production costs" or clarify whether it includes transportation costs, the Rogers court gave no indication that it intended this language as anything other than a summary of Garman’s holding.
¶33       Accordingly, we interpret "production costs" to mean the same category of costs to which Garman applied the enhancement test; namely, "certain processing costs" that enhance the value of marketable gas. 886 P.2d at 661. We are not persuaded that the court in Rogers intended to extend the enhancement test to include the transportation costs incurred by lessees to move gas to downstream markets.
¶34       The Rogers court specifically addressed transportation costs later in the opinion when it articulated the general framework for determining whether costs are deductible:
Absent express lease provisions addressing allocation of costs, the lessee’s duty to market requires that the lessee bear the expenses incurred in obtaining a marketable product. Thus, the expense of getting the product to a marketable condition and location are borne by the lessee. Once a product is marketable, however, additional costs incurred to either improve the product, or transport the product, are to be shared proportionately by the lessor and lessee. All costs must be reasonable.
 
29 P.3d at 906 (emphasis added). Thus, when referring to the deduction of post-marketability transportation costs, the court in Rogers required only that such costs be "reasonable." Id. The court did not state that such costs must also result in an increase in royalty revenues, as would be required under the enhancement test.
¶35       Other portions of the Rogers opinion focused on two questions that are not at issue in this appeal: (1) whether the royalty owners’ leases were silent regarding allocation of costs and (2) how to define marketability. However, Rogers discussed transportation costs in addressing those two questions, and both parties argue that those portions of the opinion support their positions regarding the application of the enhancement test.
¶36       The Rogers court determined that the leases were silent regarding allocation of costs, and rejected the argument that all transportation costs were deductible based on lease language providing for payment of royalties "at the well." Id. at 900. Instead, the court stated that the deductibility of transportation costs, like other types of costs, "is based on whether the gas is marketable before or after the transportation cost are incurred." Id. As in Garman, the Rogers court cited Kuntz’s treatise for the "general rule" that "costs incurred after a marketable product has been obtained, that either enhance the value of the product or cause the product to be transported to another location, are shared by the lessee and the lessor." Id. (citing 3 Eugene Kuntz, A Treatise on the Law of Oil and Gas § 40.5, at 351 (1989 & 2001 Supp.). It concluded that, absent express provisions allocating costs, it was "inconsistent to carve out a rule for transportation costs alone." Id.
 
¶37       The Rogers court also declined to carve out a separate rule for transportation costs when it addressed the definition of marketability. Id. at 906. The court looked to the first marketable product rule for guidance, as explained in a treatise by Owen Anderson, and held that gas is marketable when it is (1) in a marketable condition and (2) in the location of the commercial marketplace. Id. at 904-06 (citing Owen L. Anderson, Royalty Valuation: Should Royalty Obligations Be Determined Intrinsically, Theoretically, or Realistically, Part 2 (Should Courts Contemplate the Forest or Dissect Each Tree?), 37 Nat. Resources J. 611, 637-42 (1997)).
¶38       However, the court specifically rejected the first-marketable product rule’s separate treatment of transportation costs:
We recognize that pursuant to the first-marketable product rule, as explained by Anderson, transportation costs to a distant market are to be shared proportionately between the lessors and lessees. This allocation of transportation costs is consistent with the view the "at the well" language must be given some meaning. However, we have concluded that the "at the well" lease language in this case is silent as to allocation of all costs, including transportation costs. Under these circumstances, the logic of the first-marketable product rule requires that the allocation of all costs be determined based on when the gas is marketable. Thus, we decline to single out transportation costs and treat them differently than other costs.
 
Id. at 906 (emphasis added).
¶39       Plaintiffs argue that, because Rogers "declined" to carve out a separate rule for transportation costs in those portions of the opinion, the court intended that the enhancement test apply to post-marketability transportation costs as well. We are not persuaded. Those passages concerned whether transportation costs could be excluded from the general rule that costs incurred before gas is marketable are not deductible. See id. at 900, 906. Those passages did not address the conditions that must be met to deduct costs incurred after gas is marketable, nor did they address the applicability of the enhancement test.
¶40       Given the statement from Rogers that specifically addresses transportation costs incurred after gas is marketable, we cannot conclude, as did the district court, that Rogers requires application of the enhancement test. Instead, we conclude that Rogers requires only that transportation costs be reasonable, see id. at 906, and does not require that such costs enhance the value of the gas in order to be deducted from royalty payments.
¶41       Plaintiffs also rely on Mittelstaedt v. Santa Fe Minerals, Inc., an Oklahoma case that cited Garman in applying the enhancement test to transportation costs incurred after the gas was marketable. 954 P.2d 1203, 1208 (Okla. 1998). However, Mittelstaedt was decided before our supreme court announced Rogers, and, in any event, the Oklahoma court’s application of Garman is not controlling in Colorado.
 
¶42       In sum, we conclude that neither Garman nor Rogers requires that transportation costs incurred after the first commercial market enhance the value of the gas or increase royalty revenues in order to be deducted from royalty payments.
D. Other Considerations
¶43       We further conclude that other considerations militate against requiring transportation costs to meet the enhancement test.
¶44       As WPX argues, imposing an enhancement requirement on transportation costs, particularly on a month by month basis, ignores the "commercial realities of the marketplace." Rogers, 29 P.3d at 905. The Rogers court took those realities into account in defining marketability, see id., and we conclude that they should also be considered in determining whether to require transportation costs to meet the enhancement test.
¶45       An enhancement test which compares gas prices in downstream markets to those in the Piceance Basin does not account for the significant increase in the volume of gas produced from plaintiffs’ wells as a result of downstream marketing. There was evidence presented at trial that plaintiffs realized a tenfold increase in the volume of gas produced during the eight-year period at issue, and a mere price comparison does not indicate whether the same volume of gas could have been sold in the local market. Moreover, WPX maintains that its decision to transport gas out of the Piceance Basin altered local prices, and it is unlikely that those same prices would be available had the gas only been sold locally.
¶46       The enhancement test sought by plaintiffs and imposed by the district court also fails to take into account the long-term nature of decisions to market gas downstream. There was evidence presented at trial that operators such as WPX must invest in long-term transportation contracts to guarantee access to downstream markets and to obtain higher downstream prices and that those decisions cannot be made or changed on a monthly basis. Thus, a month by month enhancement requirement is inconsistent with the long-term nature of the downstream marketing strategy and its long-term benefits.
¶47       Anderson’s article explains that "[a]llowing the deduction of . . . transportation costs is important to assure that royalty law does not skew the lessee’s determination of the best market location. Under modern gas marketing scenarios, many producers may choose to operate extensive transportation networks. Royalty law should not ‘artificially’ discourage this choice." Anderson, 37 Nat. Resources J. at 691-92.
¶48       Although the court in Rogers rejected Anderson’s view that transportation costs incurred to reach the first commercial market are deductible from royalty payments, see 29 P.3d at 906, it did not address Anderson’s reasoning with respect to the deduction of transportation costs beyond the first commercial market. WPX persuasively argues that once gas reaches the commercial marketplace, operators should be given flexibility in determining where to market the gas to achieve the best results for all concerned. We are persuaded that requiring operators to prove that downstream marketing enhanced the value of the gas before deducting costs each month could discourage them from pursuing a downstream marketing strategy with long-term benefits for both operators and royalty owners.
¶49       Indeed, WPX asserts in its brief that plaintiffs received over $6,000,000 in additional royalty revenues over the eight-year period that they would not have received had the gas been sold locally. Plaintiffs have not refuted this claim and at trial their own marketing expert admitted that selling gas downstream was a reasonable strategy to achieve the highest prices. Under these circumstances, we are not persuaded that WPX should be required to refrain from deducting transportation costs based solely on a month by month comparison of prices. Such a rule would give plaintiffs a "free ride" by allowing them to enjoy the long-term benefits of WPX’s downstream marketing strategy in certain months, while avoiding paying their proportionate share of the costs in other months.
¶50       We also conclude, contrary to the district court, that section 34-60-118.5(2), (2.3) and (2.5) has no bearing on whether the enhancement test applies to the deductibility of post marketability transportation costs. If it did, one would expect that the statute would have been discussed in Garman or Rogers, but it is not. Rather, the statute prescribes the timing of when royalty payments must be made, and the information that must be provided by the payor. It does not address the propriety of deduction of expenses. See Grynberg v. Colo. Oil & Gas Comm’n, 7 P.3d 1060, 1063 (Colo. App. 1999) (section 34-60-118.5 does not create an entitlement to proceeds; it presumes the existence of such an entitlement and imposes deadlines for the payment to those legally entitled to receive payment).
¶51       Plaintiffs argue that the enhancement test is necessary to protect their interests as nonworking interest owners because they cannot participate in marketing and transportation decisions. See Garman, 886 P.2d at 660. However, even without the enhancement test, operators still have an implied duty under their leases to act diligently and prudently in marketing the gas for royalty owners. See id. at 659. If an operator pursues an imprudent downstream marketing strategy that harms royalty owners, it may be subject to a claim for breach of that duty, separate and apart from a claim for improper deduction of costs. See Rogers, 29 P.3d at 908-09.
¶52       Moreover, we are not persuaded that plaintiffs’ interests conflict with WPX’s interests with respect to marketing the gas. All of the parties’ interests are served by a marketing strategy that achieves the highest possible sales price with reasonable transportation costs.
¶53       We have concluded that Garman and Rogers do not require transportation costs to meet the enhancement test and that imposing such a requirement is inconsistent with marketplace realities. Thus, transportation costs beyond the first commercial market need not enhance the value of the gas, such that actual royalty revenues increase in proportion to those costs, to be deductible from royalty payments.
¶54       Because plaintiffs have conceded that the costs of transporting the gas to downstream markets were reasonable, we conclude that those costs were deductible from royalty payments.
III. Conclusion
¶55        The judgment is reversed and the case is remanded with directions to enter judgment in favor of WPX.
JUDGE BERGER and JUDGE ROTHENBERG concur.

[1] The first reserved claim concerned interpretation of certain lease provisions not at issue here. The district court entered summary judgment in favor of WPX on that claim in 2010, and a division of this court affirmed. See Lindauer v. Williams Prod. RMT Co., (Colo. App. No. 10CA0798, Apr. 21, 2011) (not published pursuant to C.A.R. 35(f)).
[2]Garman addressed whether costs could be allocated to overriding royalty interest owners, whose interest is typically created by an agreement separate from the lease. Garman v. Conoco, Inc., 886 P.2d 652, 653, 656 (Colo. 1994). However, in Rogers, the supreme court later held that Garman’s analysis applied equally to royalty interests derived from oil and gas leases. See Rogers v. Westerman Farm Co., 29 P.3d 887, 902 n.16 (Colo. 2001).